**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

....................................................................X

JOHN FLYNN, SR., LEONA FLYNN, JOHN FLYNN, JR., ELAINE FLYNN, JAMES FLYNN, FOX ROCK LLC, ANNA LIVIA LLC, THE BLOOMSDAY TRUST, MOUNTVILLE DEVELOPMENTS LIMITED, LAKEBRIDGE LIMITED, BENRAY LIMITED, TREFTON LIMITED, ARUBA PROPERTIES LIMITED, BLUECROWN LIMITED, KOMADY & MICHAEL O'REILY (TRADING AS BELGARD RETAIL PARK LIMITED), STONEWOOD DEVELOPMENTS, MALLIA PROPERTIES LIMITED, ISLAND ASSOCIATES LIMITED, BELLPARK DEVELOPMENTS LIMITED, EYRIN DEVELOPMENTS LIMITED, DR. JOSEPH SHEEHAN, and BLACKROCK MEDICAL CORPORATION,

Civ. No.
13-cv-09035

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs,

-against-

NATIONAL ASSET MANAGEMENT AGENCY/NATIONAL ASSET MANAGEMENT LIMITED, SEAN FITZPATRICK, TIARNAN O'MAHONEY, ALAN DUKES, ARTHUR MICHAEL ROYAL AYNSLEY, BYRNE WALLACE, JERRY SHEEHAN, SHEEHAN AND COMPANY, FRANK DALY, BRENDAN MCDONAGH, NIALL WHITE, BARRY O'BRIEN, MICHAEL HOEY, MICHAEL FOLEY, LAURA MULROONEY, AIDEEN O'REILLY, DES WHYTE, RONAN O'BYRNE, KIERAN DUGGAN, JOE MCWILLIAMS, SEAN TOBIN AND MICHAEL O'SULLIVAN,

Defendants.

....................................................................x

**FIRST AMENDED COMPLAINT**

Plaintiffs John Flynn, Sr., Leona Flynn, John Flynn, Jr., Elaine Flynn, James Flynn, Fox Rock LLC, Anna Livia LLC, The Bloomsday Trust, Mountville Developments Limited, Lakebridge Limited, Benray Limited, Trefton Limited, Aruba Properties Limited, Bluecrown Limited, Komady & Michael O'Reilly (trading as Belgard

1

Retail Park), Stonewood Developments, Mallia Properties Limited, Island Associates Limited, Bellpark Developments Limited, Eyrin Developments Limited, Dr. Joseph Sheehan, and Blackrock Medical Corporation (collectively, "Plaintiffs"), by and through their undersigned counsel, Leonard Zack and Associates, file this Complaint **against** The National Asset Management Agency ("NAMA")/National Asset Management Limited ("NAML"), Sean Fitzpatrick, Tiarnan O'Mahoney, Alan Dukes, Arthur Michael Royal Aynsley, Byrne Wallace, Jerry Sheehan, Sheehan and Company, Frank Daly, Brendan McDonagh, Niall White, Barry O'Brien, Michael Hoey, Michael Foley, Laura Mulrooney, Aideen O'Reilly, Des Whyte, Ronan O'Byrne, Kieran Duggan, Joe McWilliams, Sean Tobin and Michael O'Sullivan (collectively, "Defendants"), averring as follows:

## PRELIMINARY STATEMENT

1.     This civil RICO action, brought pursuant to 18 U.S.C § 1861 *et seq.*, arises from a fifteen-year criminal enterprise and conspiracy, and its subsequent cover-up, involving three separate but related criminal schemes carried out by (i) the Anglo Irish Bank Corporation Limited (the "Bank"); (ii) its successor, the Irish Bank Resolution Corporation ("IBRC") (controlled by the Irish Government) (iii) the Bank's (and its successors') chairmen, principals, and employees; (iv) the National Asset Management Agency/National Asset Management Limited ("NAMA/NAML") (a special purpose vehicle partially owned by the Irish Government), (v) NAMA/NAML's chairman, principals, and employees; and (vi) related parties.  The purpose of each scheme was to defraud Plaintiffs (borrowers) of millions of dollars in cash and other assets.

2

2.     The RICO enterprise and conspiracy began with a "<u>Fraudulent Interest Overcharging Scheme</u>" (the first scheme) involving (a) deliberately overcharging interest on loans through the manipulation of interbank lending rates; (b) perpetuating this fraud by knowingly enforcing this overcharged interest, and (c) further perpetuating it by way of a cover-up, lawsuits, threats, property seizures obstructions of justice, and witness tampering.

3.     As a separate "<u>False Security Documents Scheme</u>" (the second scheme) wherein Bank employees, Byrne Wallace, Sheehan and Company, and Jerry Sheehan (a) created false security documents as collateral to back Bank loans issued to Plaintiffs Dr. Joseph Sheehan and John Flynn; (b) perpetuated this fraud by knowingly demanding payment from Dr. Sheehan based upon these false documents; (c) continued the fraud by seizing and converting Dr. Sheehan's assets based upon these false documents; and (d) perpetuated it by attempting to use these false documents to unlawfully convert payments due to Plaintiffs.

4.     As a separate "<u>Undervaluation of Assets and Self-Dealing Scheme</u>" (the third scheme), NAMA/NAML, its chairman, chief executive officer, and employees (a) intentionally undervalued Plaintiffs' assets securing their loans; (b) disclosed confidential information about Plaintiffs' assets to third parties; (c) sold and/or offered to sell or lease Plaintiffs' assets to third parties at deflated prices for corporate or personal gain at Plaintiffs' expense and (d) interfered with Plaintiffs property rights by imposing uneconomic lease arrangements, using fraudulent legal process to block the sale of assets to which NAMA/NAML has no legal claim and illegally appointing receivers over assets.

5.      Plaintiffs are entities and individuals who, beginning in or about 1994, borrowed in excess of $200 million from the Bank in more than eighty-four variable rate loan transactions based on Irish and/or European interbank interest rates, involving the Dublin Interbank Offered Rate (the "DIBOR") and/or the European Interbank Offered Rate (the "EURIBOR") (collectively, "DIBOR/EURIBOR").  As is described below, the Bank and related parties manipulated this rate to create fraudulent interest overcharges.

6.      Plaintiffs used the borrowed funds to purchase and develop real estate nationally, in Ireland, and in the United Kingdom.  Most properties developed with these funds are highly valuable commercial office blocks and institutional buildings.

7.      Plaintiffs discovered the Bank's systematic fraudulent interest overcharges in 2010.  Collectively, these overcharges exceed $12 million.

8.      Although the Bank, its principals, and successors had first-hand knowledge of these overcharges, they never rectified them.  Rather, they conspired with the Irish Government and others to cover up this corruption.

9.      As is detailed below, the corruption and conspiracy involved numerous RICO predicate acts of mail and wire fraud (18 U.S.C. §§ 1341 and 1343), and obstructions of justice and witness tampering (18 U.S.C. §§ 1503 and 1512).

10.     In addition to RICO claims, Plaintiffs also assert fraud, trespass to chattels, conversion, unjust enrichment, constructive trust, civil conspiracy, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and negligence.

**THE PARTIES**

11.     Plaintiff John Flynn, Sr. is an individual residing at 300 Ridgeview Drive, Palm Beach, Florida 33480.

12.     Plaintiff Leona Flynn is an individual residing at 300 Ridgeview Drive, Palm Beach, Florida 33480.

13.     Plaintiff John Flynn, Jr. in an individual residing at 300 Ridgeview Drive, Palm Beach, Florida 33480.

14.     Plaintiff Elaine Flynn is an individual residing at 522 City Place South Tower, 550 Okeechobee Blvd., West Palm Beach, Florida 33401.

15.     Plaintiff James Flynn is an individual domiciled and permanently residing in the Republic of Ireland.

16.     Plaintiff Fox Rock LLC is a Florida LLC with a registered address at 5100 PGA Blvd., Suite 501, Building #2-4A, Palm Beach Gardens, Florida 33418.

17.     Plaintiff Anna Livia LLC is a Florida LLC with a registered address at 5100 PGA Blvd., Suite 501, Building #2-4A, Palm Beach Gardens, Florida 33418.

18.     Plaintiff The Bloomsday Trust is a Florida Trust with a registered address at 777 South Flagler Drive, Suite 500 East, West Palm Beach, Florida 33401.

19.     The following plaintiffs are entities residing outside of the United States but either controlled by plaintiffs Leona Flynn, John Flynn, Jr., Elaine Flynn, and James Flynn (the "Flynn Family"), or subject to the Flynn Family's personal guarantees:

> Mountville Developments Limited, Lakebridge Limited, Benray Limited, Trefon Limited, Aruba Properties Limited, Bluecrown Limited, Komady & Michael O'Reily (trading as Belgard Retail Park), Stonewood Developments, Mallia Properties Limited, Island Associates Limited, Bellpark Developments Limited, and Eyrin Developments Limited.

20.     Plaintiff Dr. Joseph Sheehan ("Dr. Sheehan") is an individual residing at 28 West 531 Roosevelt Road, Winfield, Illinois 60190.

21.     Plaintiff Blackrock Medical Corporation is an Illinois corporation with a registered address at 12931 Meed Ct., Palos Park, Illinois 60464.

22.     Defendant the National Asset Management Agency/National Asset Management Limited ("NAMA/NAML") is an Irish commercial enterprise with a registered address at The Treasury Building, Grand Canal Street, Dublin 2, Ireland.   It is majority-owned by private investors (including Irish Life Investment Managers, New Ireland Assurance, and private clients of AIB Investment Managers), and minority-owned by the Irish Government.   Upon information and belief, either directly or though its subsidiaries, NAMA/NAML (i) holds properties and loans secured by United States properties (including New York City properties); (ii) engages in state and federal litigation in the United States; and (iii) and maintains a subsidiary registered in Florida.

23.     Upon information and belief, Defendant Sean Fitzpatrick ("Fitzpatrick") was the Chairman and Chief Executive Officer ("CEO") of the Bank until December 2008.  From time to time, he worked at and managed the Bank's New York office (which existed until September 2013), at 222 E 41st Street # 24, New York, New York 10017 (the "New York Office").  Upon information and belief, he currently resides at Camderry, Whitshed Road, Greystones, County Wicklow, Ireland.

24.     Upon information and belief, Defendant Tiarnan O'Mahoney ("O'Mahoney") was the Chief Operating Officer ("COO") of the Bank when Plaintiffs' loans were transacted.  From time to time worked at and managed the Bank's New York Office.   Upon

information and belief, he currently resides at Glenpines, Old Long Hill Road, Enniskerry, Co. Wicklow, Ireland.

25.     Upon information and belief, Defendant Des Whyte ("Whyte") published the Bank's interest rates under O'Mahoney's direction. Whyte resides in the Republic of Ireland.

26.     Upon information and belief, Defendants Ronan O'Byrne ("O'Byrne"), Kieran Duggan ("Duggan"), Joe McWilliams ("McWilliams") and Michael O'Sullivan ("O'Sullivan") were Bank officers involved with Plaintiffs' loans.  Upon information and belief, they reside in the Republic of Ireland.

27.     Upon information and belief, Defendant Sean Tobin ("Tobin") was the Bank employee responsible for Plaintiffs' loans.  He later became, and continues to be, a NAMA/NAML employee.  He maintains an office address at The Treasury Building, Grand Canal Street, Dublin 2, Ireland.

28.     Upon information and belief, Defendant Arthur Michael Royal Aynsley ("Aynsley") was the CEO of the Bank, and then the IBRC, until February 2013.  Upon information and belief he is currently resident at 27 Bracken Avenue, Clapham, London SW12 8BJ and during all relevant times, he managed the Bank's United States offices, including the New York Office.

29.     Upon information and belief, Defendant Alan Dukes ("Dukes") was Chairman of the Bank, and then IBRC, until February 1013.  In these capacities, he oversaw Aynsley's activities.  He resides at Tully West, County Kildare, Ireland

30.     Upon information and belief, Defendant Byrne Wallace is an Irish solicitors law firm retained by the Bank, which maintains an office at Ireland House, 17th Floor, 345

Park Avenue, New York, New York 10154. Byrne Wallace managed Dr. Sheehan's loans.

31.     Upon information and belief, Defendant Jerry Sheehan ("Sheehan") is an attorney whose practice is located at 1 Clare Street, Dublin 2, Ireland. Defendant Sheehan forged Plaintiff Dr. Sheehan's signature on various loan security documents.

32.     Upon information and belief, Defendant Sheehan and Company is an Irish solicitors law firm with its principal office at 1 Clare Street, Dublin 2, Ireland.

33.     Upon information and belief, Defendant Brendan McDonagh ("McDonagh") is the CEO of NAMA/NAML and maintains an office at The Treasury Building, Grand Canal Street, Dublin 2, Ireland. He resides at 11 Beechpark Orchard, Castleknock, Dublin, 15.

34.     Upon information and belief, Defendant Frank Daly ("Daly") is the Chairman of NAMA/NAML and maintains an office at The Treasury Building, Grand Canal Street, Dublin 2, Ireland. He resides at Terenure, Dublin 6W.

35.     Upon information and belief, Defendants Niall White ("White"), Barry O'Brien ("O'Brien"), Michael Hoey ("Hoey"), Michael Foley ("Foley"), Aideen O'Reilly ("O'Reilly"), and Laura Mulrooney ("Mulrooney") were employees of the Bank, and now NAMA/NAML, with office addresses at The Treasury Building, Grand Canal Street, Dublin 2, Ireland.

## JURISDICTION AND VENUE

36.     Subject matter jurisdiction is proper pursuant to 18 U.S.C § 1964; 28 U.S.C. § 1330; and 28 U.S.C. § 1332.

8

37.     To the extent that NAMA/NAML is an organization of the Irish State, Ireland has waived sovereign immunity under the 1950 United States-Ireland Friendship Treaty and/or the "commercial activity exception" per 28 U.S.C. § 1605(a)(2).

38.     The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

39.     Personal jurisdiction is proper pursuant to 28 U.S.C. § 1330(b) and 28 U.S.C. § 1608(a) because within New York, defendants have owned property, maintained offices, transacted business, loaned money, conducted litigation to recover real property, and/or engaged in real estate transactions.   Moreover, NAMA/NAML's wholly-owned subsidiary, National Asset Sarasota LLC (a Florida Company with a registered office at 1201 Hays Street Tallahassee, Florida 32301-2525) owns assets in the United States.

40.     Venue is proper pursuant to 18 U.S.C. § 65(a) and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction herein, conduct business and litigation herein, and own real assets herein.

## FACTS

### I.     The First Scheme:  The Fraudulent Interest Overcharging Scheme

#### A.     The Bank Issues Loans to Plaintiffs To Be Based on the DIBOR/EURIBOR Interest Rate

41.     Beginning in or about 1994, Plaintiffs collectively borrowed more than $200 million from the Bank in over eighty-four loan transactions.  *See* **Exhibit A.**

42.     Plaintiffs used these loans to purchase and develop real estate in the United States, in Ireland, and in the United Kingdom.

43.     Many of these loans were transacted at the Bank's offices in New York, Chicago, and/or Boston.

44.     As to most of these loans, the Bank demanded and received personal guarantees from Plaintiffs.

45.     Defendants Fitzpatrick, O'Mahoney, O'Byrne, Whyte, Duggan, Tobin, McWilliams, Byrne Wallace, and O'Sullivan were directly involved in negotiating and affecting these loans, along with Bank staff in Chicago, Boston, and New York.

46.     All of these loans were based on the DIBOR/EURIBOR interest rate.

47.     O'Mahoney and Whyte, under Fitzpatrick's direction, established the Bank's daily interest rate (which was to be based on the daily DIBOR/EURIBOR interest rate).

48.     The Bank and O'Byrne precluded Plaintiffs from taking loans from any other bank (in Ireland or in the United States) by threatening that the Bank would demand immediate repayment of all outstanding loans if Plaintiffs were to do so.  These acts fraudulently induced Plaintiffs to continue borrowing from only the Bank.

### B.     The Bank Fraudulently Overcharges Interest in Excess of the DIBOR/EURIBOR Rate

49.     In 2010, Plaintiffs discovered that the Bank, per O'Mahoney's instructions, and with the explicit approval of Fitzpatrick and the Bank's directors, had overcharged interest on all of their loans (in excess of the DIBOR/EURIBOR rate).

50.     In October 2010, Plaintiffs retained BankCheck Ltd. ("BankCheck") to forensically analyse their accounts and those of third parties.

51.     BankCheck's report (*see* **Exhibit B** for a summary) revealed systematic interest overcharging perpetuated by an intentional manipulation of the DIBOR/EURIBOR rate – a practice that had endured for well over a decade.  This overcharging represented more than $1.6 billion and 10% of the Bank's annual basis.

52.     BankCheck determined that the Bank's interest overcharges against Plaintiffs exceeded $12 million.

53.     Even after Aynsley (the Bank's CEO) and Dukes (the Bank's Chairman), learned from Plaintiffs about these overcharges, the situation was never rectified.   Rather, a conspiracy to conceal the fraud was conducted along with the Irish Government and NAMA/NAML, which had acquired a large number of fraudulent loans from the Bank..

54.     In August of 2010 Aynsley admitted that overcharging occurred, and announced an investigation by the Bank.   However, no results of this investigation were ever made public and the Bank authorized only 2% of the overcharging to be remedied.   No remedy was provided to Plaintiffs.  *See* **Exhibit C**.

55.     Upon information and belief, the Bank's investigation (under Aynsley and Dukes' direction) discovered these overcharges, but it covered-up its findings of fraud as part of the ongoing conspiracy with NAMA/NAML and the Irish Government to preserve the value of the Bank's (and its successors') assets.

###          C.       *NAMA/NAML Acquires Loans Containing Fraudulent Interest Overcharges*

56.     Because the Bank was failing, in 2008 the Irish Government injected additional capital into it and guaranteed all of its liabilities. By January 2009, the Irish Government became the Bank's sole shareholder.

57.     Thereafter, the Bank, at the direction of the Irish Minister of Finance, liquidated its assets at steep discounts.   In 2010, it sold €35 billion of loans – including the loans at issue here – to NAMA/NAML, a for-profit company created by the National Asset Management Agency Bill of 2009.

58.     NAMA is a special purpose vehicle owned by both the Irish Government (49%) and private investors (51%).  Its wholly owned subsidiary, National Asset Management Limited ("NAML"), manages NAMA's sales of loans and assets obtained from the Bank.

59.     In December 2010, the Irish Government enacted the Credit Institutions (Stabilisation) Act 2010, giving the Irish Minister for Finance sweeping powers over the Bank and NAMA/NAML.  For example, it allows the Minister for Finance to obtain *ex parte* orders from the High Court allowing the Bank to take "any action," including sales of assets and liabilities.  The Minister for Finance and his department thus played an important coordination role among the Bank, NAMA/NAML, McDonagh, Daly, Dukes and Aynsley.

60.     On February 7, 2013, by way of emergency legislation, the Irish Government liquidated the Bank/IBRC.  It also replaced the IBRC Board, including Dukes and Aynsley, with members of the accountancy group KPMG, and it appointed two Special Liquidators from KPMG.   This emergency legislation made NAMA/NAML the Bank's/IBRC's only secured creditor.

61.     In August 2013, Declan Ganley, a prominent Irish businessman, filed a criminal complaint with the Irish Police regarding the Bank's fraudulent interest overcharges. This criminal investigation is ongoing..

### D.    NAMA/NAML Is Informed Of The Fraudulent Overcharging

62.     In or about 2010, Eddie Fitzpatrick of BankCheck provided email notice of the Bank's overcharges to NAMA/NAML and the National Treasury Management Agency ("NTMA").  BankCheck estimated the total overcharges to be $1.6 billion.  (Plaintiffs contend they were overcharged more than $12 million.)

63.    NTMA provides asset and liability management services to the Irish Government, and business and support services to NAMA.   It employs all NAMA/NAML staff members.  NAMA reimburses the NTMA for costs.

64.    NTMA/NAMA received but never responded to BankCheck's notices and warnings about the overcharges.

65.    Shortly thereafter, NAMA/NAML, in conspiracy with Anglo/IBRC and its management, NTMA and the Irish Department of Finance agreed to a criminal conspiracy to cover up the fraudulent charges and intimidate the Flynn Plaintiffs into silence. This conspiracy was intended to protect the value of the Anglo/IBRC debt, all of it tainted by fraudulent overcharges, so as to maximize the value of the sale of that debt. At this point NAMA/NAML and its officers and employees became an active participant in the criminal conspiracy.

66.    In the Summer of 2010 plaintiff James Flynn met with NAMA/NAML employees White and O'Brien, providing the conclusions of the BankCheck report and direct notice that all loans acquired from the Bank contained fraudulent interest overcharges.

67.    NAMA/NAML never acknowledged or remedied the fraud.   Instead, it aggressively denied the fraud and continued the cover-up (which is on-going to date).

68.    Upon information and belief, NAMA/NAML, Dukes, Aynsley, Daly and McDonagh conspired with the Irish Government and the Irish Bank Regulator to cover up the fraud to avoid reimbursing Plaintiffs and to avoid jeopardizing the Bank's and NAMA/NAML's sales of loans to third parties.

   ***E.     NAMA Perpetuates the Bank's Fraud By Knowingly Enforcing the Fraudulent Interest Overcharges***

69.     Under Daly's and McDonagh's direction, NAMA/NAML (through White, O'Brien, Hoey, Foley, O'Reilly, and Mulrooney) has perpetuated the Bank's fraud by knowingly enforcing the fraudulent interest overcharges.

70.     To date, NAMA/NAML continues to charge compounded interest on the balance of the loans, thereby increasing the fraudulent interest overcharges.

71.     To date, NAMA/NTML continues to demand payment on these fraudulent interest overcharges, and it seeks to enforce Plaintiffs' personal guarantees on these loans.

72.     Until NAMA's recent appointment of receivers to the Flynn properties, Plaintiffs have, under protest, paid the interest demanded.

> **F.     NAMA Perpetuates the Bank's Fraud By Way of a Cover-up, Lawsuits, Threats, and Property Seizures**

73.     NAMA has initiated a widespread campaign to cover up the fraud.

74.     NAMA/NAML continues to perpetuate the Bank's fraud by charging additional interest compounded on top of the fraudulent interest and by seeking to cover up the fraudulent interest.

75.     It has also sued Plaintiffs in Irish courts to recover monies and assets based upon the fraudulent interest overcharges (including property owned by plaintiff Leona Flynn, who does not hold a loan with NAMA/NAML).

76.     NAMA/NAML has threatened the Flynn Family that it will seize assets if they do not pay outstanding interest charges (which are fraudulent).

77.     NAMA/NAML has also sought to intimidate and silence Plaintiffs by threatening retribution against them unless they "cooperate" with NAMA/NAML, meaning they cease demanding a remedy for the fraud.

78.     NAMA/NAML is also seeking property seizures from Plaintiffs based on these fraudulent interest overcharges.

79.     NAMA/NAML, and its employees McDonagh, Foley, and Mulrooney have moved to appoint receivers over certain Flynn Family assets in order to seize these properties.  *See* **Exhibit E.**

> **G.     NAMA Perpetuates the Bank's Fraud By Obstructing Justice and Tampering with Witnesses**

80.     Although pursuant to the IBRC Liquidation Act (Section 6(2)(b)), Plaintiffs may not sue the Bank/IBRC in Ireland, on June 6, 2013, Plaintiffs sued IBRC, NAMA, and related defendants in the Southern District of New York.   *See Flynn v. Irish Bank Resolution Corp.*, 1:13-cv-03882-NRB (SDNY) (the "Prior SDNY Action").

81.     In that action, Plaintiffs seek (i) rescission of the fraudulent loans, (ii) rescission of personal guarantees given with regard to the loans; and (iii) payment of sums wrongfully obtained by IBRC and NAMA pursuant to the fraud.

82.     In response to this lawsuit, NAMA/NAML, Daly, McDonagh, Foley, and Mulrooney began a campaign of intimidation against Plaintiffs, amounting to criminal obstruction of justice and witness tampering in violation of 18 U.S.C. §§ 1503 and 1512. They threatened to deprive Plaintiffs of property controlled by NAMA/NAML and to seize Plaintiffs' assets unless Plaintiffs dropped their legal action.

83.     NAMA/NAML, White, and O'Brien sent several written and email communications to Plaintiffs in the Prior SDNY Action threatening retaliation if they did not withdraw their claims.  These threats caused at least five plaintiffs to withdraw.

84.     As was foreshadowed by NAMA/NAML's threatening letters (and those sent by White and O'Brien), NAMA/NAML engaged in a systematic effort to retaliate against the plaintiffs who continued their claims, but not against those who withdrew.

### H.     The Special Liquidators Of IBRC Stay The Prior SDNY Action

85.     On August 26, 2013, The Special Liquidators of IBRC filed a Verified Petition under Chapter 15 for Recognition of a Foreign Proceeding (the "Chapter 15 Petition") in the Bankruptcy Court for the District of Delaware, Case No. 13-12159-CSS.  A principal purpose of this filing was to affect a stay on the Prior SDNY Action.

86.     On September 13, 2013, Plaintiffs opposed the Chapter 15 Petition, objecting as follows:  (1) IBRC is a foreign bank within the meaning of 11 U.S.C. § 1501(C)(L) and thus is not eligible to be a debtor under Chapter 15; (2) the Petition fails to justify the Irish proceeding as a foreign main proceeding; and (3) pursuant to Section 1506 of the Bankruptcy Code, public policy should preclude recognition.

87.     On September 9, 2013, IBRC's Special Liquidators applied the automatic say to the Prior SDNY Action.

88.     On December 18, 2013, the Chapter 15 bankruptcy was recognized.  Plaintiffs are appealing this decision to the district court in Delaware.

89.     On December 20th 2013 Plaintiffs filed a RICO Complaint in the Federal District Court for the Southern District of New York (the "Original RICO Complaint").

90.     On the 31st of December the Special Liquidators filed a complaint in the Federal Bankruptcy Court for the District of Delaware objecting to the Original RICO Complaint

16

91.    On the 23rd of January the Federal Bankruptcy Court issued a temporary stay against Plaintiffs proceeding with the Original RICO Complaint pending modification of the Original RICO Complaint.

92.    On the 6th of March 6, 2014 the Federal Bankruptcy Court in Delaware signed an order granting permission for the Plaintiffs to file this Complaint in the Federal District Court for the Southern District of New York. *See* **Exhibit D.**

### II.    The Second Scheme:  The False Security Documents Scheme

93.    In March, 2006, Dr. Sheehan, Mr. John Flynn, and others borrowed in excess of $35 million from the Bank to invest in shares of The Blackrock Hospital.

94.    Byrne Wallace managed the Bank's documentation of these loans.

95.    In 2012, Dr. Sheehan discovered that the Bank, Byrne Wallace, Tobin, and O'Sullivan conspired to create false security documents as collateral to back Bank loans issue to Dr. Sheehan.  Specifically, they colluded with (i) Jerry Sheehan and (ii) Jerry Sheehan's law firm, Sheehan and Company, to obtain Jerry Sheehan's forged signatures on mortgage documents in Dr. Sheehan's name without authorization from Dr. Sheehan.

96.    With knowledge of this fraud, and based upon these fraudulent documents, Byrne Wallace (i) demanded that Dr. Sheehan repay funds; (ii) effected seizure and conversion of Dr. Sheehan's assets (in excess of $2 million); and (iii) continues to seek dividend payments from the Blackrock Hospital, which rightfully belong to Dr. Sheehan.

### III.    The Third Scheme:  The Undervaluation of Assets and Self-Dealing Scheme

97.    NAMA/NAML have acquired from the Bank all of the Flynn Plaintiff loans which are subject to the fraudulent overcharging.

98.     Upon information and belief, NAMA/NAML, Daly, McDonagh, Foley, and Mulrooney have sought to systematically loot Plaintiffs' assets held by NAMA/NAML for their own benefit, the benefit of NAMA/NAML, and that of related parties.

99.     Plaintiffs have direct knowledge that a former NAMA executive disclosed to an agent, who acting for a prospective purchaser of Plaintiffs' loans, confidential information (including information about the Flynn plaintiffs' businesses, rent receipts, business plans, and business forecasts) to defraud Plaintiffs, to the benefit of NAMA/NAML, its executives, and employees.

100.    As part of this scheme, NAMA/NAML also sought to dispose of Plaintiffs' assets at below market value to related third parties for the benefit of NAMA/NAML, its executives, its employees, and the Irish Government.

101.    NAMA/NAML Daly, and McDonagh have interfered with the Flynn Plaintiffs property rights, abused judicial process to block the sale of assets, appointed receivers over assets and interfered in the Flynn Plaintiff's ongoing management of assets by interfering in rental arrangements, all for the benefit of NAMA/NAML, its executives, its employees and the Irish Government.

102.    NAMA/NAML, its executives, and employees have conspired with buyers of NAMA/NAML loans to defraud borrowers, including Plaintiffs.  To date, two NAMA employees have been criminally charged.  Plaintiffs believe this conspiracy permeates the organization.

103.    On December 18, 2013, Irish fraud detectives confirmed they were investigating whether NAMA/NAML manipulated the price it paid the Bank for Plaintiffs' loans so as to unjustly enrich itself, its executives, employees, and related entities.

104.    Plaintiffs are cooperating with the Irish police fraud division in its investigation of criminal acts by NAMA/NAML and its employees.

### FIRST CLAIM:  VIOLATIONS OF RICO 18 U.S.C. § 1962(C)
**(Against All Defendants)**

105.    Plaintiffs herein incorporate all prior paragraphs in this Complaint.

106.    At all relevant times, Plaintiffs have been persons within the meaning of 18 U.S.C.§§ 1961(3) and 1962(c).

107.    At all relevant times, defendants have been persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

108.    Defendants conducted, managed, and operated the three fraudulent schemes as an association-in-fact enterprise per 18 U.S.C. §§ 1961(4) and 1962(c)) and through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of § 1962(c).

109.    The Irish Government and NAMA/NAML primarily fund the enterprise. The Irish Department of Finance and the Irish Minister for Finance control its criminal activities. NAMA/NAML, McDonagh and Daly oversee it.  The enterprise thus has a command structure by which individual actors have assigned responsibilities.

110.    The Fraudulent Interest Overcharging Scheme (the first scheme) involves (a) manipulating interbank interest rates (DIBOR/EURIBOR) so as to deliberately overcharge interest on loans; (b) perpetuating this fraud by knowingly enforcing this overcharged interest, and (c) further perpetuating this fraud by way of a continuing cover-up, lawsuits, threats, property seizures, obstructions of justice and witness tampering.

111.    All defendants except Jerry Sheehan and Sheehan and Company are involved in the Fraudulent Interest Overcharging Scheme.

112.   The "False Security Documents Scheme" (the second scheme) involves (a) creating false security documents as collateral to back Bank loans issued to Plaintiff Dr. Sheehan; (b) perpetuating this fraud by knowingly demanding payment from Dr. Sheehan based upon these false documents; and (c) perpetuating this fraud by seizing and converting Dr. Sheehan's assets based upon these false documents.

113.   The defendants involved in this scheme include Fitzpatrick, Byrne Wallace, Tobin, O'Sullivan, Jerry Sheehan and Sheehan and Company.

114.   The "Undervaluation of Assets and Self-Dealing Scheme (the third scheme) involves (a) intentionally undervaluing Plaintiffs' assets securing their loans; (b) disclosing confidential information about Plaintiffs' assets to third parties; and (c) selling these assets to third parties at deflated prices for personal gain at Plaintiffs' expense.

115.   The defendants involved in this scheme include NAMA/NAML, Dukes, Aynsley, McDonough and Daly.

116.   As is described below, the enterprise committed the following predicate acts per 18 U.S.C. § 1961, constituting a pattern of racketeering per 18 U.S.C. § 1961(5):

**1.   Mail and Wire Fraud, in Violation of 18 U.S.C. §§ 1341 and 1343**

117.   Defendants committed mail and wire fraud in violation of 18 US.C. §§ 1341 and 1343. **Exhibit E** (attached hereto) contains a chart of the relevant mailings, telephone calls, website postings, and emails, including dates and parties involved.

118.   The fraudulent mail and wire communications involved, *inter alia*, false and misleading statements about Plaintiffs' loans and debts in the form of false bank statements, false statements of accounts, false loan and interest statements, false reporting on loan balances and interest payments due, fraudulent information on applicable interest

rates, fraudulent demands for payment of loans including known overcharged interest, falsified security documents, appointments of receivers without justification, transfer of funds by NAMA/NAML to the Bank, property seizures of Plaintiffs' assets, and electronic filings of false sworn legal documents.

**2.    Obstruction of Justice and Witness Tampering in Violation of _18 U.S.C. §§ 1503 and 1512_**

119.    After the Prior SDNY Action was filed (i) White and O'Brien threatened Plaintiffs in that case with retribution against them, their families and their assets if they did not withdraw the complaint against NAMA/NAML. As a result of these threats several plaintiffs dropped out of the Prior SDNY; (ii) the Bank's Special Liquidators seized cash assets from Dr. Sheehan and instructed Byrne Wallace to take his other assets; (iii) NAMA, McDonagh, Hoey, Foley, O'Reilly and Mulrooney, following up on their threats to the Plaintiffs in the Prior SDNY Action sought to appoint receivers to the Flynn Family's assets in a further attempt to obstruct their legal rights;  (iv) NAMA engaged in a concerted effort to procure false testimony from its employees and to cause them to withhold relevant documents and testimony; and (v) NAMA filed (or caused to be filed) false court documents.

120.    These acts constitute obstruction of justice and witness tampering in violation of 18 U.S.C. §§ 1503 and 1512.

121.    As a result, Plaintiffs have been injured pursuant to 18 U.S.C. § 1962(c) as to their reputation and goodwill; impairment of interests in executed contracts; impairment of rights and interest in property; and as to the expense of attorneys' fees and costs to prosecute claims and to prevent illegal seizures.

122.   These injuries were a direct, proximate, and reasonably foreseeable result of Defendants' violation of 18 U.S.C. § 1962.

123.   Plaintiffs are thus entitled to treble damages, attorneys' fees, and costs, per 18 U.S.C. § 1964(c).

124.   Plaintiffs are also entitled to a preliminary and permanent injunction precluding Defendants, their assignees, and anyone acting in concert with them, from any action (directly or indirectly) (i) to recognize or enforce any debt, including any personal guarantees by Plaintiffs as security; (ii) to obtain judgment in any court, tribunal, or agency anywhere (here or abroad) regarding the debt or guarantees; and (iii) to attach or seize Plaintiffs' assets (or those of Plaintiffs' subsidiaries or co-venturers) whether pre-judgment or otherwise, prior to this Court's entry of judgment herein.

### SECOND CLAIM:  RICO CONSPIRACY, 18 U.S.C. § 1962(d)
#### *(Against All Defendants)*

125.   Plaintiffs herein incorporate all prior paragraphs in this Complaint.

126.   Defendants willfully conspired in violation of 18 U.S.C. § 1962(d).  Each co-conspirator knew his predicate acts were part of the enterprise and that his participation was necessary to conduct the racketeering activity.

127.   This conspiracy (i) damaged Plaintiffs' reputation and goodwill; (ii) impaired Plaintiffs' contracts interests; and (iii) impaired Plaintiffs' rights to property and funds. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages plus attorneys' fees and costs.

128.   Plaintiffs are also entitled to a preliminary and permanent injunction precluding defendants, their assignees, and anyone acting in concert with them, from any action (directly or indirectly) (i) to recognize or enforce any debt, including any personal

guarantees by Plaintiffs as security; (ii) to obtain judgment in any court, tribunal, or agency anywhere (here or abroad) regarding the debt or guarantees; and (iii) to attach or seize Plaintiffs' assets (or those of Plaintiffs' subsidiaries or co-venturers) whether pre-judgment or otherwise, prior to this Court's entry of judgment herein.

### THIRD CLAIM:  FRAUD
*(Against Fitzpatrick, O'Mahoney, Duggan, Tobin, McWilliams, O'Sullivan, Aynsley, NAMA/NAML, Sheehan, Sheehan and Company, and Byrne Wallace)*

129.    Plaintiffs herein incorporate all prior paragraphs in this Complaint.

130.    Each scheme described above amounts to a separate cause of action for fraud. The following defendants are liable:  Fitzpatrick, O'Mahoney, Duggan, Tobin, McWilliams, O'Sullivan, Aynsley, NAMA/NAML, Sheehan, Sheehan and Company, and Byrne Wallace.

131.    Upon entering the loans, Fitzpatrick, O'Mahoney, Tobin, McWilliams and O'Sullivan knew their statements and omissions were false.  They also knew or should have known that Plaintiffs would be persuaded to invest in the loans due to the statements of the Bank's loan officer, Duggan, who vouched for the veracity of the agreements.

132.    Aynsley and NAMA/NAML, with full knowledge of this fraud, continued to demand payment of the fraudulent interest and used legal action and asset seizures to further the fraud.

133.    Fitzpatrick, Tobin, Byrne Wallace, Sheehan, and Sheehan and Company created fraudulent security documents, forged Dr. Sheehan's signature on such documents, and converted assets of Dr. Sheehan based upon those fraudulent documents.

134.    Byrne Wallace continues to demand payment of funds based upon known fraudulent security documents.

135.    Fitzpatrick, Tobin, O'Byrne, McWilliams, O'Sullivan, and Duggan also induced false guarantees from Plaintiffs by way of material misrepresentations and omissions.

136.    Plaintiffs are thus entitled to damages, rescission of the loans, termination of all guarantees, and reimbursement of the overcharges plus interest.

### FOURTH CLAIM:  TRESPASS TO CHATTELS
### (Against Daley, McDonagh, Hoey, O'Brien, White, Foley, Mulrooney, O'Reilly, NAMA/NAML and Byrne Wallace)

137.    Plaintiffs herein incorporate all prior paragraphs in this Complaint.

138.    By way of the foregoing schemes, Daly, McDonagh, Hoey, White, O'Brien, Foley, Mulrooney, O'Reilly, NAMA/NAML, and Byrne Wallace have intentionally, without justification, interfered with Plaintiffs' use and enjoyment of (i) their funds intended for business purposes; (ii) their real and personal property; and (iii) their business reputations and goodwill.

139.    Accordingly, Plaintiffs seek compensatory and punitive damages.

140.    Plaintiffs are also entitled to a preliminary and permanent injunction precluding the Defendants, their assignees, and anyone acting in concert with them, from any action (directly or indirectly) (i) to recognize or enforce any debt, including any personal guarantees by Plaintiffs as security; (ii) to obtain judgment in any court, tribunal, or agency anywhere (here or abroad) regarding the debt or guarantees; and (iii) to attach or seize plaintiffs' assets (or those of Plaintiffs' subsidiaries or co-venturers) whether pre-judgment or otherwise, prior to this Court's entry of judgment herein.

### FIFTH CLAIM: CONVERSION
### (Against McDonagh, Hoey, Foley, White, O'Brien, Mulrooney, O'Reilly and NAMA/NAML)

141.    Plaintiffs herein incorporate all prior paragraphs in this Complaint.

24

142.   Defendants McDonagh, Hoey, Foley, Mulrooney, O'Reilly and NAMA/NAML have unlawfully assumed the control and ownership of property belonging to the Flynn Plaintiffs to the exclusion of their rights.

143.   Accordingly, Plaintiffs seek compensatory and punitive damages.

144.   Plaintiffs are also entitled to a preliminary and permanent injunction precluding Defendants, their assignees, and anyone acting in concert with them, from any action (directly or indirectly) (i) to recognize or enforce any debt, including any personal guarantees by Plaintiffs as security; (ii) to obtain judgment in any court, tribunal, or agency anywhere (here or abroad) regarding the debt or guarantees; and (iii) to attach or seize Plaintiffs' assets (or those of Plaintiffs' subsidiaries or co-venturers) whether pre-judgment or otherwise, prior to this Court's entry of judgment herein.

## SIXTH CLAIM: UNJUST ENRICHMENT
### *(Against NAMA/NAML)*

145.   Plaintiffs herein incorporate all prior paragraphs in this Complaint.

146.   Defendant NAMA/NAML has been unjustly enriched in obtaining millions of dollars from Plaintiffs through fraudulent overcharging.

147.   Accordingly, plaintiffs seek disgorgement of all ill-gotten gains.

148.   Plaintiffs are also entitled to a preliminary and permanent injunction precluding Defendants, their assignees, and anyone acting in concert with them, from any action (directly or indirectly) (i) to recognize or enforce any debt, including any personal guarantees by Plaintiffs as security; (ii) to obtain judgment in any court, tribunal, or agency anywhere (here or abroad) regarding the debt or guarantees; and (iii) to attach or seize Plaintiffs' assets (or those of Plaintiffs' subsidiaries or co-venturers) whether pre-judgment or otherwise, prior to this Court's entry of judgment herein.

## SEVENTH CLAIM: CONSTRUCTIVE TRUST
### (Against NAMA/NAML)

149.   Plaintiffs herein incorporate all prior paragraphs in this Complaint.

150.   To remedy the unjust enrichment described above, this court should impose a constructive trust upon NAMA/NAML so as to effect the disgorgement of ill-gotten gains.

## EIGHTH CLAIM:  CIVIL CONSPIRACY
### *(Against All Defendants)*

151.   Plaintiffs herein incorporate all prior paragraphs in this Complaint.

152.   Defendants have conspired to commit racketeering, fraud, trespass to chattels, and conversion in an unlawful scheme to obtain property from Plaintiffs.  These acts were malicious, willful, and fraudulent.

153.   As a result of this conspiracy, Plaintiffs have been damaged in their business and property.  Moreover, threat of further damage is imminent.

154.   Plaintiffs seek compensatory and punitive damages.

155.   Plaintiffs are also entitled to a preliminary and permanent injunction precluding Defendants, their assignees, and anyone acting in concert with them, from any action (directly or indirectly) (i) to recognize or enforce any debt, including any personal guarantees by Plaintiffs as security (ii) to obtain judgment in any court, tribunal, or agency anywhere (here or abroad) regarding the debt or guarantees; and (iii) to attach or seize Plaintiffs' assets (or those of Plaintiffs' subsidiaries or co-venturers) whether pre-judgment or otherwise, prior to this Court's entry of judgment herein.

## NINTH CLAIM:  NY JUDICIARY LAW § 487
### *(Against Byrne Wallace)*

156.    Plaintiffs herein incorporate all prior paragraphs in this Complaint.

157.    New York Judiciary Law § 487 provides in relevant part as follows:

158.    An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

159.    Byrne Wallace has engaged in an intentional pattern of collusion, wrongdoing, and deceit seeking to deceive Plaintiffs and Irish courts.

160.    Each has prepared false and misleading court claims regarding the forged and fraudulent security documents.

161.    As a result of this wrongdoing, Plaintiffs are entitled to treble damages and reasonable attorneys' fees.

### TENTH CLAIM:  BREACH OF FIDUCIARY DUTY
*(Against Fitzpatrick, O'Mahoney, and Duggan. Tobin, O'Byrne, O'Sullivan, Dukes, Aynsley, Daly, McDonagh and NAMA/NAML)*

162.    Plaintiffs herein incorporate all prior paragraphs in this Complaint.

163.    Fitzpatrick, O'Mahoney, Duggan, McWilliams, Tobin, O'Byrne, O'Sullivan, Dukes, Aynsley, Daly, McDonagh, and NAMA/NAML each owed Plaintiffs a fiduciary duty in effecting and managing their Loans.  They occupied a position of trust and confidence and thus owed Plaintiffs a duty of care as to honest management and administration of their money and investments.

164.    These defendants knowingly and willfully misappropriated funds by overcharging interest.

165.    They further breached their fiduciary duty by intentionally misrepresenting that the loan agreements would be honored (without arbitrary changes to interest).

166.    As a result of this breach, Plaintiffs are entitled to damages exceeding $12 million plus interest, and to have their personal guarantees set aside.

## ELEVENTH CLAIM:  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### *(Against NAMA/NAML)*

*Plaintiffs herein incorporate all prior paragraphs in this Complaint.*

167.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.  This implied covenant requires that no party shall do anything to impair, destroy, or injure the rights of another party in receiving the benefit of the agreement, and that all parties will do what is reasonably contemplated by the terms of the contract.

168.    NAMA/NAML failed to comply with this obligation.

169.    It engaged in acts so as to intimidate and coerce Plaintiffs into actions contrary their own interests.

170.    NAMA/NAML willfully breached its implied covenant of good faith and fair dealing by enforcing fraudulent interest overcharges against Plaintiffs and refusing to provide commercially reasonable information to Plaintiffs.

171.    As a result, Plaintiffs are entitled to compensatory damages in excess of $12,000,000, and to have their personal guarantees set aside.

## TWELFTH CLAIM:  NEGLIGENCE
**(Against  Fitzpatrick,  O'Mahoney,  Duggan,  McWilliams,  O'Byrne,  Tobin, O'Sullivan, Dukes, Aynsley, Byrne Wallace, Daly, McDonagh, and NAMA/NAML)**

172.    Plaintiffs herein incorporate all prior paragraphs in this Complaint.

173.    Defendants Fitzpatrick, O'Mahoney, Duggan, McWilliams, Tobin, O'Byrne, O'Sullivan, Dukes, Aynsley, Byrne Wallace, Daly, McDonagh, and NAMA/NAML owed Plaintiffs a duty of reasonable care and skill to maintain loan records and properly service loans transactions.

174.    Defendants breached this duty in (i) failing to assure that the applicable interest rates were charged; (ii) overcharging on interest; (iii) preparing and filing false documents; and (iv) unlawfully appointing receivers and foreclosing on properties.

175.    Dukes and Aynsley knew of the interest overcharging by the Bank and rather than exercise their duty to remedy the fraud, attempted to cover it up.

176.    Byrne Wallace used known fraudulent documents to demand payments from Plaintiffs.

177.    Daly, McDonagh, and NAMA/NAML demanded payment of interest they knew to be the fruits of overcharging and took action to seize assets and otherwise impair Plaintiffs' property in a continuing effort to further the fraud against Plaintiffs.

178.    Defendants' negligent acts have caused Plaintiffs damages in an amount to be determined at trial but not less than $12,000,000.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully the following relief:

i.      Damages in excess of $12,000,000 plus pre-judgment interest accruing at the statutory rate of 9% since 2009;

ii.     Punitive damages where applicable;

iii.    Treble damages where applicable;

iv.     Reasonable attorneys' fees and costs;

v.     Equitable relief including but not limited to a temporary restraining order and a preliminary and permanent injunction precluding Defendants, their assignees, and anyone acting in concert with them, from any action (directly or indirectly) (a) to recognize or enforce any debt, including any personal guarantees by Plaintiffs as security; (b) to obtain judgment in any court, tribunal, or agency anywhere (here or abroad) regarding the debt or guarantees; and/or (c) to attach or seize Plaintiffs' assets (or those of Plaintiffs' subsidiaries or co-venturers) whether pre-judgment or otherwise, prior to this Court's entry of judgment herein;

vi.    Rescission of all fraudulent loan contracts and personal guarantees; and

vii.   Such other legal and equitable relief as the Court may deem proper.

## **JURY DEMAND**

179.   Plaintiffs hereby demand a trial by Jury.

Dated:      New York, New York
             March 7, 2014

Leonard Zack & Associates

By: _____

Leonard Zack, Esq.
405 Park Avenue
10th Floor
New York, NY 10022
(212) 754-4050

Lawrence Daniel O'Neill
O'Neill and Company
240 Central Park South
New York, NY 10019
(917) 675 4864

*Attorneys for Plaintiffs*

Rachel Schulman, Esq. PLLC
14 Bond Street, Suite 143
Great Neck, NY 11021
(917) 270-7132

*Of Counsel*

## EXHIBIT A

## LIST OF LOANS SUBJECT TO OVERCHARGING

| DATE | LOAN DESCRIPTION | LOAN AMOUNT | ESTIMATED OVERCHARGE | STATUS |
|---|---|---|---|---|
| 12.05.2008 | Blackrock Partnership | €6,683,000.00 | €122,060.00 | Paid in Full w/ Overcharges |
| 06.04.1998 | Coolbrook Developments Ltd | IR£1,600,000.00 | | Paid in Full w/ Overcharges |
| 11.02.1999 | Coolbrook Developments Ltd | IR£7,000,000.00 | | Paid in Full w/ Overcharges |
| 03.04.2000 | Coolbrook Developments Ltd | IR£9,500,000.00 | | Paid |
| 27.10.2000 | Coolbrook Developments Ltd | IR£10,550,000.00 | | Paid |
| 11.06.2004 | Coolbrook Developments Ltd | €29,752,000.00 | | Paid |
| 16.05.2006 | Coolbrook Developments Ltd | €54,247,000.00 | €236,845.00 | Paid |
| 31.01.2008 | Coolbrook Developments Ltd | €8,756,000.00 | | Paid |
| 19.06.2002 | Belfield Office Park Ltd | €20,633,243.76 | | NAMA |
| 21.01.2003 | Belfield Office Park Ltd | €10,475,000.00 | €184,000.16 | NAMA |
| 02.06.2006 | Bellpark Developments Ltd | €17,578,000.00 | | NAMA |
| 15.03.2007 | Bellpark Developments Ltd | €19,100,000.00 | | NAMA |
| 07.10.2008 | Bellpark Developments Ltd | €20,600,000.00 | €105,307.00 | NAMA |
| 07.03.2005 | Pizarro Developments Ltd | €130,000,000.00 | | NAMA |
| 07.03.2005 | Pizarro Developments Ltd | €171,800,000.00 | | NAMA |
| 03.11.2008 | Pizarro Developments Ltd | €14,000,000.00 | €4,717,124.00 | NAMA |
| 09.11.2006 | Aruba Properties Ltd | €27,532,000.00 | | NAMA |
| 10.04.2007 | Aruba Properties Ltd | €38,352,000.00 | €163,511.00 | NAMA |
| 02.12.2008 | Aruba Properties Ltd | €45,142,000.00 | | NAMA |

| | | | | |
|---|---|---|---|---|
| 23.08.2000 | DM Investments Ltd | IR£1,276,000.00 | | Paid in Full w/ Overcharges |
| 13.08.2001 | DM Investments Ltd | €1,904,607.11 | | |
| 10.02.2004 | DM Investments Ltd | €686,000.00 | €5,306.00 | |
| 08.07.1999 | Kilberry Group Properties Ltd | IR£1,600,000.00 | | Paid in Full w/ Overcharges |
| 06.10.1999 | Kilberry Group Properties Ltd | IR£500,000.00 | | |
| 29.01.2002 | Kilberry Group Properties Ltd | €1,132,606.30 | | |
| 20.03.2003 | Kilberry Group Properties Ltd | €1,970,000.00 | €31,038.00 | |
| 28.03.2006 | Benray Ltd | €7,298,489.00 | €31,592.00 | Acquired by NAMA |
| 19.02.2008 | Benray Ltd | €2,010,000.00 | | NAMA |
| 06.06.2006 | Tibany Properties Ltd | €19,670,000.00 | €33,918.00 | Paid |
| 28.06.2004 | Foxrock LLC | $3,500,000.00 | | Paid |
| 24.02.2005 | Foxrock LLC | €1,000,000.00 | €3,455.16 | Paid |
| 27.07.1998 | Fusano Properties Ltd | IR£800,000.00 | | Paid |
| 22.05.2002 | Fusano Properties Ltd | €21,330,000.00 | €581,918.00 | Paid |
| 05.12.2007 | Fusano Properties Ltd | €37,000,000.00 | | Paid |
| 29.11.2005 | Bluecrown Ltd | €7,390,000.00 | | NAMA |
| 15.12.2005 | Bluecrown Ltd | €2,550,000.00 | | NAMA |
| 13.12.2006 | Bluecrown Ltd | €10,470,000.00 | | NAMA |
| 09.08.2007 | Bluecrown Ltd | €17,170,000.00 | | NAMA |
| 23.09.2008 | Bluecrown Ltd | €17,217,000.00 | €68,009.00 | NAMA |
| | Bluecrown (Swap) | | €913.950.00 | NAMA |
| | | | | |
| | | | | |
| 12.12.2000 | Shieldpoint Ltd | £3,500,000.00 | | Paid |
| 01.04.2004 | Shieldpoint Ltd | £39,402,114.00 | £113,463.00 | Paid |
| 08.05.2006 | Bloomsday Trust | $12,500,000.00 | $6,337.00 | Paid |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT B**

**SUMMARY BANKCHECK REPORT**



Interim Report & Analysis of Interest Rate Charges on Anglo Irish Bank

## Introduction:

BankCheck as a company has audited bank accounts throughout Ireland and the UK since 2001.  During that period, it has assisted clients to recover in excess of €30m in refunds.

BANKCheck has been commissioned to conduct a forensic analysis of Anglo Irish Bank loan accounts to establish the extent to which the Bank had systematically overcharged interest on customers' loan accounts for the period 1990 - 2013.  We have been forensically auditing Bank accounts for over 17 years during which time we have assisted clients in recovering in excess of €30m in refunds

To complete the analysis we have relied on documentation supplied by Anglo Irish Bank customer including loan statements, facility letters and any other documentation together with information supplied by IBRC, in particular the "Historical Enquiries Team" which (according to IBRC) was set up in light of allegations of "interest rate loading". We have concentrated our efforts on two specific periods, 1990 to 2004 and 2002 to 2012.

## Summary:

Our primary finding indicates that the "loading" of DIBOR/EURIBOR rates charged to customer accounts by Anglo Irish Bank was not only systemic but also deliberate from 1990 to 2004.   Furthermore in 2002 Anglo Irish Bank adopted a new method of calculating interest on its borrowers accounts by altering their internal charging system. This new system increased the underlying rate thereby generating interest overcharges on all its customer The primary finding of the report is that the Bank engaged in not only systematic but also deliberate  "loading" of DIBOR/EURIBOR rates charged to customer accounts from 1990 to 2004.   Furthermore in 2002 Anglo Irish Bank adopted a new method of calculating interest on its customers' accounts by altering their internal charging system.  The Bank claimed at the time that this "new system" would not affect the amount of interest applied to their customers' accounts.  This report will prove that the Bank not only charged more interest but the result was a substantial increase in profits to the tune of €1 billion.  Moreover this practice was not confirmed to Euro loans but other currencies primarily US Dollar accounts.  Despite being made aware of the potential problems it could encounter, the Bank and its "guardians" chose not only to ignore the concerns of its customers but also to continue with its flawed system, a practice that continues to this day.

**Key facts:**

- 130 variable rate DIBOR/EURIBOR loan accounts were audited for 29 separate customers for the period 1991 to 2004.  Every account for every customer was found to have been overcharged as a result of "loading" the interest rates.

- 26 LIBOR based loan accounts were audited for the period 1990 to 2004.  Every account was found to have been overcharged as a result of "loading" the interest rates.

- 527 separate DIBOR/EURIBOR rates were reconciled, all of which were "loaded" by Anglo Irish Bank.

- The degree of "loading" ranged from 0.5% in the early nineties to between 0.03% to 0.05% in 2002 and 2003.

- Observing the parameters outlined by Anglo Irish Bank Chief Executive, Mike Aynsley, the amount the bank overcharged its customers by "loading" DIBOR/EURIBOR was in excess of €500m.

- All accounts examined post 2002 indicated overcharging due to the implementation of a "new" charging method.  A conflict between the bank's facility letters and its general terms and conditions for accounts opened after 01/01/2002, implies that every Anglo Euro account since that date has been overcharged.

**Background**

In early September 2010, Mike Aynsley, Chief Executive of Anglo Irish Bank commented on the allegation of interest rate loading[1]:

180.    **"….We don't think that this is a widely spread thing.  There might have been a few small pockets of it over time and then it sort of stopped so we suspect it was driven by some kind of process errors".**

If the "loading" of DIBOR[2] & EURIBOR[3] rates by Anglo Irish Bank (which subsequently became part of IBRC[4]) was the result of a problem within its processing systems then, by the very nature of the problem, there should be a clear correlation between what the

---

[1] Source: Irish Independent
[2] DIBOR (Dublin Interbank Offered Rate) ceased to be Ireland's reference bank rate from 31/12/98 on Ireland's entry into the Eurozone at which time EURIBOR was introduced
[3] EURIBOR (Euro Interbank Offered Rate) introduced as a reference rate in Ireland 01/01/99
[4]  IBRC – The Irish Bank Resolution Corporation formed in 2011 as the result of a state mandated merger between INBS (Irish Nationwide Building Society) & Anglo Irish Bank. Entered into Special Liquidation February 2013.

Bank charged and what should have been charged. By this I mean either the "percentage loading" or the actual amount of the 'loading' should be the same (for a given period of time at least).

The following hypothetical example highlights the difference in meaning between "loading of rates" and "percentage loading of rates":

| Date | Rate Charged | Actual Rate | Loading | % Loading |
|------|--------------|-------------|---------|-----------|
| 01/01/99 | 4% | 3% | 1% | 33.33% |
| 01/02/99 | 5% | 4% | 1% | 25% |
| 01/03/99 | 3.5% | 2.5% | 1% | 40% |

From the illustration above one can determine that although there are differences in the "% loading" there is a clear correlation in the "loading" of the rates by 1% (being the difference between what was charged and what should have been charged).  In this specific scenario the bank could argue that the error was due to a "systems problem" as there is a distinctive pattern emerging over the set period of time.

The second example below shows the clear correlation in the "percentage loading":

| Date | Rate Charged | Actual Rate | Loading | % Loading |
|------|--------------|-------------|---------|-----------|
| 01/01/99 | 10% | 8% | 2% | 25% |
| 01/02/99 | 7.5% | 6% | 1.5% | 25% |
| 01/03/99 | 5% | 4% | 1% | 25% |

The "percentage loading" demonstrates by way of percentage (rather than amount) how the actual rate was increased.  Therefore even though the amount by which the rates were "loaded" varies (from between 1% and 2%), the percentage by which the underlying rates are "loaded" is exactly the same (25%).  Once again given this circumstance the bank may argue that the cause of the problem could be the result of a "programming error"

If, however, there is no evidence of correlation over a given period in either the "percentage loading" or the interest rate "loading" amount, then the purpose and motivation behind the differential in rates must be queried.

## *Analysis*

### *Overloading of EURIBOR rates*

257 Anglo Irish Bank loan accounts have been audited covering the period 1990 – 2013[5].  These have been split into two categories; drawdown pre 2004 (130 accounts) and drawdown post 2004 (127 accounts).   The main reason for this divide is that the Bank (by their own admittance) ceased the practice of "loading" reference rates (i.e. EURIBOR and DIBOR) in 2004.

---

[5]  1990 – 2001 Ireland's currency was the Irish Pound (Punt).  €Euro was the adopted currency from 01/01/02

The vast majority of Anglo Irish Bank loans reviewed was charged at a variable rate of DIBOR/EURIBOR  (i.e. 1 month, 3 month etc.) plus a margin.

Each loan account was reconstructed using both information contained in the bank statements (i.e. balance, date, credits, debits) and information contained in the facility letters (i.e. reference rate, margin, repayment schedule etc…).  Please note we have focused on the negotiated terms of the contract, which are specific to each customer, rather than the generic general terms and conditions.   The loans amounts varied from circa IR£11k to €165m.

Using information contained in Appendix 1 we will endeavour to highlight the methods involved in this process (for reasons of confidentiality, the customer's name and account number have been omitted pro tem from the attached bank statements).     These particular statements cover a period from 1995 to 2001.  (Note the interest rates charged to the account do not appear on the bank statements until 1999, the relevance of which will become clear at a later stage in the report.)

The reason why we have highlighted this specific example is that the Bank has supplied a full breakdown of the rates that were applied to this account (including prior to 1999) together with the rates that should have been applied.   In so doing the Bank confirmed that every rate charged to this account was "loaded" (Refer to page 1 of Appendix 2).  This spreadsheet details the rates applied (i.e. charged) and rates applied in recalculation (i.e. what should have been charged) for the account ending 02, to which the bank statements from Appendix 1 refers.  The column titled "total rate" (in Appendix 2) and illustration below clearly backs up our assertion that the so-called "differences" between the rates could not have been system driven.

| Date | Applied | Recalculated | Loading | % Loading | |
|---|---|---|---|---|---|
| 29/09/95 | 6.3125% | 5.875% | | 0.4375% | 7.44% |
| 27/12/95 | 6% | 5.5% | 0.5% | 9.09% | |
| 27/03/96 | 5.4375% | 5.1643% | 0.2732% | 5.29% | |
| 27/06/96 | 5.5625% | 5.25% | 0.3125% | 5.95% | |

A complete analysis of the remainder of the loan (up to 05/01/04) uncovered "loading" in every rate and fundamentally highlighted that there was no consistency or correlation in the "loading".

Appendix 2 is a breakdown of rates for 11 separate accounts for the same customer (as provided by the Historic Enquiries team of IBRC).  If we compare the "total rate" column in the "rates applied to the account" breakdown & the "rates applied to the recalculations" breakdown we can see quite clearly that every account was subjected to persistent loading of DIBOR and EURIBOR rates for the duration of the loan.

In a further analysis of 28 customers with a total of 119 accounts, every variable rate DIBOR/EURIBOR loan account drawndown prior to 2004 was found to have been subjected to a "loading" of interest rates.

Appendix 3 shows a breakdown of all loans analysed to include the date of drawdown,

date of final repayment (where applicable) and the amount borrowed (with some exceptions). The cost to the customer was examined for each transgression. The total value of the loans audited was approximately €1.3 billion resulting in overcharging of interest in the region of €25m.

In Appendix 4 we have detailed and documented in date order the relevant rates[6] charged by Anglo Irish Bank and compared them with the rates that should have been charged on each appropriate date. In all, 527 rates from 1991 until 2004 have been recorded. Furthermore we have highlighted (in red) occasions where we can clearly show that the "percentage loading" and "amount of loading" are not even consistent on specific dates.

The findings are quite conclusive. For the years 1990-1994 the amounts by which the rates were being loaded appear to be constant. However after 1994 there is no consistency whatsoever in either the "percentage loading" or the actual amount by which the rates were "loaded". Whereas the Bank could argue that this proves the "loading" was systematic during this period I firmly believe it actually augments our claim that the errors could not have been caused by anything other than intervention and interference from senior personnel within the Anglo Irish Bank.

### *Overloading of LIBOR rates:*

The underlying problems are not confined to Euro loans and a number of "foreign currency" accounts have been analysed as follows:

27 £ Sterling loans
18 US Dollar loans
2 DM (pre euro) loans

As a result of the Bank refunding monies to a customer's LIBOR (UK) based loan account (as part of their Historical Enquiries investigation) we decided to carry out a similar analysis on other LIBOR loans (Refer to Appendix 5).

We have detailed LIBOR (UK) rates charged by Anglo Irish Bank on specific dates and compared them against the LIBOR rates that should have been charged, covering the period 1999 - 2005 (Appendix 6). The results again are pretty conclusive.

### **Pre 2004 loans:**

144 accounts (both Sterling and Euro) with drawdowns prior to 2004 have been audited and all accounts have been subjected to "loading". Furthermore the Bank issued its customers with invoices (i.e. bank statements) in the full knowledge that they contained falsified transactions (i.e. interest amounts and rates). (It should be noted that the Anglo Irish Bank 'End of Year Financial Statements' also contained this deceptive

---

[6] The rates in question vary between 1 week, 1 month and 3 month DIBOR/EURIBOR. There is however instances where we have had to rely on total rates (i.e. reference rate + margin + RAC) as these were the only rates provided by the Bank but the outcome (i.e. proof of loading) remained unaffected.

information.)

From the evidence gathered we are in no doubt that the "loading" of rates was so widespread that the vast majority of Anglo Irish Bank customers were affected.

**Estimated total monetary amount of DIBOR/EURIBOR overloading:**

When Anglo Irish Bank produced its **estimate** of the total amount of overcharging to the period up to 2004, the parameters were:

1. Interest percentage overcharge amount: 0.03% − 0.05%
2. Period of overcharge: 1998 − 2004
3. A statement that there were only a few "small pockets" of overcharging "over time" and
4. "We suspect it was driven by some kind of process errors" (Refer to media statements, Appendix 7)

These considerations resulted in the Bank estimating refunds to customers in monetary terms of between €30m - €50m.

Bankcheck's findings are:

1. The period of DIBOR/EURIBOR "loading" was 14 years, not 6 years.
2. Over the period, the true "loading" was circa ten times the amount the bank has claimed (somewhere between 0.25% & 0.5%).
3. The "small pockets" were actually the vast majority.
4. The overcharging was deliberate and was not caused by processing errors.

Utilising the above parameters, the overcharging on Anglo Irish Bank's Euro accounts should be closer to €0.5 billion.   This figure does not include the foreign currency accounts (in particular the LIBOR (UK) based accounts).

**Conflict between Facility Letter and General Terms:**

From the numerous post 2002 Anglo Irish Bank facility letters examined, it is clear that there is a conflict between the main facility letter and the general terms and conditions of every Anglo Irish Bank Euro loan since that date.   This flaw also occurred in the case of Anglo Irish Bank US Dollar loans.

When Ireland changed currency in 2002 all loans were converted to the Euro (at a rate of €1 = IR£0.787564).  At this time Anglo Irish Bank claim to have written to all its customers informing them of changes to their internal system for calculating interest whilst, at the same time, confirming to its customers that the amount of interest charged would not be affected  (refer to Appendix 8). This statement by the bank was incorrect and is best shown by way of an illustration:

A 1 million loan drawdown on 1st January 2001 with an assumed rate of 5%

(being say 3 month Euribor + 2%) would indicate an annual interest charge for the 2001 year of 50k (assuming the balance and interest rate did not change).

If the same loan drawndown on 1st January 2002 for the same amount with the same rates (and the rates and balance didn't change for a year), one would expect to pay the same amount of interest as paid in 2001, i.e. 50k. However, in 2002, Anglo Irish Bank would have charged interest of 50,694. The other mainstream banks in Ireland (i.e. AIB, BoI, ACC, NIB or UB) would have charged 50k in 2001 & 2002.

When Anglo Irish Bank stopped the practice of "loading" EURIBOR rates in 2004 it should have been possible to reconcile every rate on every statement to four decimal places (unless of course there was another problem such as an incorrect margin being applied).   Yet a complete interest audit on any Anglo Irish Bank Euro or US dollar account can never reconcile the interest charged, as the Bank is actually using a higher rate of interest than is noted on the Bank statements.

When this fact was brought to the attention of the Bank they referred to the General Terms and Conditions (Appendix 9, see Section 20.2, headed "Economic and Monetary Union") in which they claimed to charge interest on a 360-day year basis. (Also refer to Appendix 9a, which gives a more detailed explanation.)

This is in clear conflict to the Bank's facility letters, which state interest shall accrue daily at the interest rate agreed (Euribor plus margin).  We would refer you to sample facility letters in Appendices 10 & 11.  Note that one letter is dated 1999 & the other letter is dated 2002. This is used to illustrate the fact that the wording contained in the facility letters (in particular the heading 'interest rate') is almost identical but the methodology for calculating the interest is different as mentioned previously (to the detriment of the customer). This particular 'method' of calculating interest has generated in the region of €1 billion in additional profit for the Bank since it was first utilised in 2002.

### Further Issues:

From investigations into Anglo Irish Bank accounts, it has been found that other issues, which are not the subject of this particular brief, should be examined in greater detail. These include but are not restricted to the mis-selling of SWAPS, the loading of RAC rates for DIBOR loans and the liquidity charges applied to LIBOR (UK) loans.

Arrangements have been made to access and investigate additional Anglo Irish Bank loan accounts in the USA and Germany in order to complete our brief, which has recently been expanded to produce documentation for presentation to the Financial Regulators and the Fraud Authorities in the UK, Ireland and the USA.

### Conclusion:

Anglo Irish Bank has manifestly engaged in a deliberate, calculated and systematic campaign to defraud thousands of its customers out of hundreds of millions of Euros

over a 20-year period throughout Ireland, the UK and the US.   Although the practice of "loading" reference rates stopped in 2004 what is unclear is the reason why it ceased, as it was a substantial "profit stream" for the Bank.  Was there an internal investigation or did one of the regulatory bodies get involved?  And, if so, why were the customers and shareholders of the Bank not informed at that time?  One possible explanation could be the "new" method of calculating interest adopted in 2002 was generating substantial profits for the Bank anyway and therefore replacing the "profits" which would have been "lost" when the loading ceased?

I also note that many of the statements I have sighted are on IBRC headed paper. Customers should be aware that IBRC operates (i.e. that are still doing it to this day) 2 separate systems for calculating interest.  One is the "old" Anglo Irish Bank system (detailed extensively in this report) whilst the other is based on the "old" INBS system. Fundamentally if you have the misfortune of being on the "old" Anglo system you will pay more interest on a like for like basis than you would if you were on the "old" INBS system.   I have asked the relevant bodies to explain this.  No response has been forthcoming.

Although these are very serious allegations which will require answers in due course, what is clear in our opinion is that these practices could not have been committed without the knowledge of those at the highest levels within the Anglo Irish Bank.

**Declaration:**

The opinions outlined in this report are based on our forensic investigations into Anglo Irish Bank loan accounts and our knowledge of the contractual relationship between the Bank and its customers.

For and on behalf of BANKCheck

E.  Fitzpatrick

**EXHIBIT C**

**AYNSLEY ADMISSION OF OVERCHARGING**

# Customers overcharged by up to €100m, admits Aynsley

JEROME REILLY and RONALD QUINLAN – 12 September 2010

Sean FitzPatrick and his discredited management team at Anglo Irish Bank may have overcharged customers by as much as €100m on loans taken out between 1999 and 2004, which will now have to be paid back, with interest, by the taxpayer, the bank's chief executive Mike Aynsley has confirmed to the Sunday Independent.

While the exact figure due for repayment will not be known until an investigation into the matter is completed, Mr. Aynsley said he was hopeful, however, that it would fall somewhere between €30m and €50m. "We're thinking at this stage that it [the cost] is more likely to be in the €30m to €50m range. It's a lot of money but certainly not as big as the billions that we normally talk about in this bank," Mr Aynsley said. Asked if the overcharging of customers was the only historical issue being looked at by the bank's new management, he said: "It's the only additional issue that we know about. We had one inquiry from a customer. Now it's an investigation because Jim Bradley, our new head of markets, started digging around and surfaced some other examples.

"Bear in mind when this happened, this was pre-2004. So this is a long time ago, so it's going to take us a little while to get to the bottom of the full scale, if there is a full scale. We don't think that this is a very widely spread thing. There might have been a few small pockets of it over time and then it sort of stopped so we suspect it was driven by some kind of process errors."
Asked if there was any evidence that the overcharging of customers had been deliberate, he said simply: "We don't know yet.

"There is a statute of limitations and, theoretically, we're probably not compelled to go back beyond a six-year period, but because we believe there are important ethical issues around this for us and our customers, we're doing it and we will compensate people accordingly." In some cases, the compensation being given will be in the form of an offset of debts still owed to the bank by affected customers, Mr Aynsley explained. "There are cases where we might owe someone money who has defaulted, or who still owes us a lot of money. Then it's a different matter. We'll just offset it against what they owe us. We won't be writing them a cheque," he added.

But even as the Anglo chief did his best to downplay the hit to the taxpayer, a Northern Ireland-based consultancy, which advises businesses and individuals who suspect they have been ripped off by the banks, claimed Anglo's estimates may be too low, saying that the true scale of overcharging at Anglo could be as high as €200m.

Consultancy BankCheck has already recovered some €15m for individual businessmen and businesses from financial institutions both sides of the Border because of overcharging. They claim that overcharging in Anglo began before 1999 and continued after July

**EXHIBIT D**
**ORDER OF THE FEDERAL BANKRUPTCY COURT FOR DELAWARE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 15 |
| IRISH BANK RESOLUTION | : | |
| CORPORATION LIMITED | : | Case No.:      13-12159 (CSS) |
| (IN SPECIAL LIQUIDATION) | : | |
| | : | |
| Debtor in a foreign proceeding. | : | |
| | : | |
| KIERAN WALLACE AND EAMONN | : | |
| RICHARDSON, AS FOREIGN | : | |
| REPRESENTATIVES ON BEHALF | : | Adversary Proceeding |
| OF IRISH BANK RESOLUTION | : | No.:   13-52547 (CSS) |
| CORPORATION LIMITED | : | |
| (IN SPECIAL LIQUIDATION), | : | RE: Docket Nos.: 22 and 26 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN FLYNN, SR., et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER

Upon consideration of the Notice, Pursuant to the Order Granting Preliminary Injunction, of Intent to File an Amended Complaint Against Non-Debtor Defendants in the Southern District of New York [*Kieran Wallace and Eamonn Richardson, as Foreign Representatives on Behalf of Irish Bank Resolution Corporation Limited (In Special Liquidation) v. John Flynn, Sr., et al.* – Case No. 13-52547] [Adv. D.I. 26] filed on February 17, 2014; the Court having reviewed the Notice and the Proposed Amended Complaint attached to the Notice as Exhibit A (the "Proposed Amended Complaint") as well as the objections

thereto; the Court having heard the statements of counsel and parties in interest regarding the Notice and the Proposed Amended Complaint at a telephonic hearing before the Court on March 6, 2014 (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) the Notice and the telephonic Hearing were sufficient notice under the circumstances; and (iv) the Court has judicial power to enter a final order.

IT IS HEREBY ORDERED THAT, for the reasons set forth at the telephonic Hearing held on March 6, 2014, the Order Granting Preliminary Injunction (Adv. D.I. 22) is modified to allow the plaintiffs in *John Flynn, Sr., et al. v. National Asset Management Agency/National Asset Management Limited*, Civ. No. 13-cv-09035 pending in the United States District Court for the Southern District of New York (the "Second New York Action") to file and prosecute the Proposed Amended Complaint in the Second New York Action.

Christopher S. Sontchi
United States Bankruptcy Court Judge

Dated: March 7, 2014

**EXHIBIT E**
**TABLE OF RICO ACTIONS**

| From | To | Date | Subject | Type of Communications |
|---|---|---|---|---|
| Brian Motherway, Anglo Irish Bank | John Flynn | 2010 | Transfer of Belfield loan to NAMA Request for falsified security documents | Telephone calls |
| Anglo Irish Bank | John Flynn and Joe Sheehan | 24/12/10 | Claim re breach of security | Letter |
| NAMA | John Flynn | 6/7/11 | Withholding Security Documents | Email |
| Anglo Irish Bank | John Flynn | 06/03/2012 | Interest Rate Overcharging | Mail |
| NAMA | John Flynn | 05/10/13 | Blackrock Hospital Security Documentation | Email |
| Anglo Irish Bank (Anglo) | Coolbrook Developments Ltd. | 1998 04 06 | Facility Letter | Mail |
| Anglo | Coolbrook Developments Ltd. | 1998 05 05 - 2008 09 23 | Statements | Mail |
| Anglo | DM Investments | 1998 06 24 - 2001 05 02 | Statements | Mail |
| Anglo | Fusano Properties Limited | 1998 07 27 | Facility letter | Mail |
| Anglo | Coolbrook Developments Limited | 1998 07 28 | Facility letter | Mail |
| Anglo | Fusano Properties Limited | 1998 07 30 - 2003 03 04 | Statements | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Fusano Properties Limited | 1998 07 30 - 2008 12 01 | Statements | Mail |
| Anglo | Aspenway Properties Limited | 1998 11 04 | Facility Letter | Mail |
| Anglo | Komady Limited | 1998 11 23 | Facility Letter | Mail |
| Anglo | Coolbrook Developments Limited | 1998 12 11 - 2007 12 07 | Statements | Mail |
| Anglo | Kilberry Group Properties Ltd | 1998 13 11 Kilberry | Facility letter | Mail |
| Anglo | Kilberry Group Properties Ltd. | 1998 13 11 | Facility Letter2 | Mail |
| Anglo | Coolbrook Developments Ltd. | 1999 01 08 - 2006 05 30 | Statements | Mail |
| Anglo | Kilberry Group Properties Ltd. | 1999 01 15- 2002 04 05 | Statements | Mail |
| Anglo | Coolbrook Developments Limited | 1999 02 11 | Facility Letter | Mail |
| | Coolbrook | | | |

| | | | | |
|---|---|---|---|---|
| Anglo | Developments Ltd. | 1999 02 11 | Facility Letter 2 | Mail |
| Anglo | Island Associates Ltd. | 1999 02 26 | Facility Letter | Mail |
| Anglo | Aspenway Properties Ltd. | 1999 05 21 | Facility Letter | Mail |
| Anglo | Fusano Properties Ltd. | 1999 06 02 | Facility Letter | Mail |
| Anglo | Fusano Properties Ltd. | 1999 06 02 | Letter of Amendment | Mail |
| Anglo | Kilberry Group Properties Ltd. | 1999 07 08 | Facility Letter | Mail |
| Anglo | Island Associates Ltd. | 1999 07 20 | Loan Offer | Mail |
| Anglo | Fusano Properties Ltd. | 1999 08 09 | Facility Letter | Mail |
| Anglo | Belfield Office Park Ltd. | 1999 09 03 - 2004 02 02 | Statements | Mail |

| Anglo | Kilberry Group Properties Ltd. | 1999 10 06 | Facility Letter | Mail |
|---|---|---|---|---|
| Anglo | Kilberry Group Properties Ltd. | 1999 10 14 - 2001 12 31 | Statements | Mail |
| Anglo | Kilberry Group Properties Ltd. | 1999 10 14 - 2002 04 05 | Statements | Mail |
| Anglo | Kilberry Group Properties Ltd. | 1999 10 15-  2002 06 17 | Statements | Mail |
| Anglo | Fusano Properties Limited | 1999 10 19 - 2008 11 11 | Statements | Mail |
| Anglo | Aspenway Properties Limited | 1999 10 29 | Facility Letter | Mail |
| Anglo | Coolbrook Developments Limited | 2000 04 03 | Facility Letter | Mail |
| Anglo | Belfield Office Park Ltd. | 2000 05 19 - 2010 08 | Statements | Mail |

| | | 31 | | |
|---|---|---|---|---|
| Anglo | Mallia Properties Ltd. | 2000 06 21 | Facility Letter | Mail |
| Anglo | Mallia Properties Limited | 2000 07 19 | Facility Letter | Mail |
| Anglo | Mallia Properties Ltd. | 2000 07 21 - 2000 07 28 | Statements | Mail |
| Anglo | Mallia Properties Ltd. | 2000 07 21 - 2000 11 22 | Statements | Mail |
| Anglo | DM Investments Ltd. | 2000 08 23; 2001 08 13; 2004 02 10 | Facility Letters | Mail |
| Anglo | Island Associates Limited | 2000 09 14 | Facility Letter | Mail |
| Anglo | Coolbrook Developments Ltd. | 2000 10 27 | Facility Letter | Mail |

| Anglo | Mallia Properties Ltd. | 2000 10 27 | Facility Letter | Mail |
|---|---|---|---|---|
| Anglo | Mallia Properties Ltd. | 2000 11 23 | Facility Letter | Mail |
| Anglo | Mallia Properties Ltd. | 2000 11 25 | Facility Letter | Mail |
| Anglo | Mallia Properties Limited | 2000 11 27 | Letter from Anglo Re: Interest | Mail |
| Anglo | Mallia Properties Ltd. | 2000 11 | Letter from Anglo re: Interest | Mail |
| Anglo | Shieldpoint Ltd. | 2000 12 12 | Facility Letter | Mail |
| Anglo | Kilberry Group Properties Ltd. | 2000 17 10 | Facility Letter | Mail |
| Anglo | Shieldpoint Limited | 2001 01 12 - 2006 08 31 | Statements | Mail |
| Anglo | Shieldpoint Limited | 2001 01 22 | Facility Letter | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Shieldpoint Limited | 2001 04 01 | Facility Letter | Mail |
| Anglo | DM Investments Limited | 2001 04 02 - 2003 11 28 | Statements | Mail |
| Anglo | Island Associates Limited | 2001 04 04 | Facility Letter | Mail |
| Anglo | Shieldpoint Limited | 2001 05 08 | Facility Letter | Mail |
| Anglo | Shieldpoint Limited | 2001 08 15 | Deed of Guaratee | Mail |
| Anglo | Shieldpoint Limited | 2001 08 17 | Loan Agreement | Mail |
| Anglo | Shieldpoint Limited | 2001 08 17 | First Supplemental Loan Agreement | Mail |
| Anglo | Shieldpoint Limited | 2001 08 17 | Second Supplemental Loan Agreement | Mail |

| Anglo | Shieldpoint Limited | 2001 08 24 - 2001 09 05 | Statements 1 | Mail |
|-------|---------------------|-------------------------|--------------|------|
| Anglo | Shieldpoint Limited | 2001 08 24 - 2001 09 05 | Statements 2 | Mail |
| Anglo | Shieldpoint Limited | 2001 08 24 - 2001 09 05 | Statements 3 | Mail |
| Anglo | Shieldpoint Limited | 2001 08 28 - 2006 08 | Statements (10) | Mail |
| Anglo | Shieldpoint Limited | 2001 08 28 - 2006 08 | Statements (11) | Mail |
| Anglo | Island Associates Limited | 2001 11 20 | Statements | Mail |
| Anglo | Nesco Properties Limited | 2001 12 12 - 2003 01 31 | Statements | Mail |
| Anglo | DM Investments Limited | 2001 12 31 - 2003 11 28 | Statements | Mail |
| Anglo | Kilberry Group Properties Ltd. | 2001 12 31 - 2006 07 06 | Statements | Mail |
| Anglo | Coolbrook Developments Limited | 2001 12 31 - 2007 12 06 | Statements | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Nesco Properties Limited | 2002 01 01 - 2003 01 31 | Statements | Mail |
| Anglo | DM Investments Limited | 2002 01 22 - 2005 07 22 | Statements | Mail |
| Anglo | Kilberry Group Properties Limited | 2002 01 29 | Facility Letter | Mail |
| Anglo | Island Associates Limited | 2002 02 02 | Facility Letter | Mail |
| Anglo | Island Associates Limited | 2002 02 19 | Facility Letter | Mail |
| Anglo | Komady Limited | 2002 02 25 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2002 03 08 | Facility Letter | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Komady Limited | 2002 04 05 | Facility Letter | Mail |
| Anglo | Aspenway Properties Limited | 2002 04 30 | Facility Letter | Mail |
| Anglo | Island Associates Limited | 2002 05 03 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2002 05 22 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2002 05 22 | Facility Letter | Mail |
| Anglo | Belfield Office Park Limited | 2002 06 19 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2002 06 20 - 2008 11 11 | Statements | Mail |
| Anglo | Fusano Properties | 2002 07 18 - 2009 01 23 | Statements | Mail |

| | Limited | | | |
|---|---|---|---|---|
| Anglo | Coolbrook Developments Limited | 2002 08 12 | Facility Letter | Mail |
| Anglo | Foxrock LLC | 2002 08 14 - 2008 11 10 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2002 08 28 - 2008 11 11 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2002 08 28- 2006 05 29 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2002 08 30 - 2008 11 11 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2002 08 30 - 2009 01 23 | Statements | Mail |
| Anglo | Island Associates Limited | 2002 09 10 | Facility Letter | Mail |

| Anglo | Fusano Properties Limited | 2002 09 25 - 2009 01 23 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2002 10 01- 2008 10 31 | Statements | Mail |
| Anglo | Kilberry Group Properties Limited | 2002 29 01 | Facility Letter | Mail |
| Anglo | Kilberry Group Properties Limited | 2003 01 12 | Facility Letter | Mail |
| Anglo | Kilberry Group Properties Limited | 2003 01 12 | Facility Letter | Mail |
| Anglo | Kilberry Group Properties Limited | 2002 01 30 | Certificate of Interest | Mail |
| Anglo | Belfield Office Park Limited | 2003 01 21 | Facility Amendment Letter | Mail |

| Anglo | Fusano Properties Limited | 2003 03 04- 2005 01 13 | Statements | Mail |
|-------|---------------------------|------------------------|------------|------|
| Anglo | Kilberry Group Properties Limited | 2003 03 20 | Facility Letter | Mail |
| Anglo | Komady Limited | 2003 06 25 | Facility Letter | Mail |
| Anglo | Kilberry Group Properties Limited | 2003 08 06 - 2006 06 29 | Statements | Mail |
| Anglo | Komady Limited | 2003 10 28 | Facility Letter | Mail |
| Anglo | Stonewood Developments Limited | 2003 12 02 | Facility Letter | Mail |
| Anglo | Stonewood Developments Limited | 2003 12 02 | Facility Letter 2 | Mail |

| Anglo | Stonewood Developments Limited | 2003 12 17 | Facility Letter | Mail |
|-------|-------------------------------|------------|----------------|------|
| Anglo | Stonewood Developments Limited | 2003 12 23 - 2006 08 18 | Statements | Mail |
| Anglo | Belfield Office Park Limited | 2004 02 02 - 2010 08 31 | Statements | Mail |
| Anglo | Stonewood Developments Limited | 2004 02 03 | Facility Letter | Mail |
| Lakebridge Limited | Anglo Irish Bank | 2004 02 09 | Email to Anglo about differing interest rate amounts | Email |
| Anglo | Kilberry Group Properties Ltd. | 2004 03 18 | Facility Letter | Mail |
| Anglo | Nesco Properties Limited | 2004 03 23 | Email from Anglo Irish Bank to Nesco stating balances on the account | Email |
| Anglo | Coolbrook Developments Limited | 2004 04 07 | Facility Letter | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Coolbrook Developments Limied | 2004 04 08 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2004 05 21 - 2008 11 11 | Statements | Mail |
| Anglo | Coolbrook Developments Limited | 2004 06 11 | Facility Letter | Mail |
| Anglo | Foxrock LLC | 2004 06 28 1230 | Facility Letter | Mail |
| Anglo | Stonewood Developments Limited | 2004 06 30 - 2006 08 18 | Statements | Mail |
| Anglo | Foxrock LLC | 2004 07 27 - 2008 05 26 | Statements | Mail |
| Anglo | Anna Livia | 2004 08 04 | Terms Sheet | Email |
| Anglo | Foxrock LLC | 2004 08 30 - 2005 04 08 | Statements | Mail |
| Anglo | Komady Limited | 2004 09 13 | Interest Rate CAP | Email |

| | | | | |
|---|---|---|---|---|
| Anglo | Fusano Properties Limited | 2004 12 07 - 2008 11 10 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2004 12 15 - 2008 11 11 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2004 12 22 | Loan Agreement | Mail |
| Anglo | Fusaano Properties Limited | 2004 12 24 - 2008 11 10 | Statements | Mail |
| Anglo | Kilberry Group Properties Limited | 2004 18 03 | Facility Letter | Mail |
| Anglo | Kilberry Group Properties Ltd | 2004 22 11 | Facility Letter | Mail |
| Anglo | Fusano Properties Ltd. | 2004 Agreement_final_0812 | Loan Agreement (final 0812) | Mail |
| Anglo | Fusano Properties | 2005 01 07 - 2008 11 10 | Statements | Mail |

| | Limited | | | |
|---|---|---|---|---|
| Anglo | Pizarro Developments Ltd. | 2005 01 09 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2005 01 13 - 2005 08 31 | Statements | Mail |
| Anglo | Flynn family | 2005 01 24 | Email Breakdown of exposure including margins | Email |
| Anglo | Fusano Properties Limited | 2005 01 26 - 2008 11 14 | Statements | Mail |
| Anglo | Island Associates Limited | 2005 02 02 | Facility Letter | Mail |
| Anglo | Mallia Properties Limited | 2005 02 02 | Facility Letter | Mail |

| Anglo | Mountville Developments Limited | 2005 02 02 | Facility Letter | Mail |
|-------|-------------------------------|-----------|----------------|------|
| Anglo | Foxrock LLC | 2005 02 14- 2007 10 31 | Statements | Mail |
| Anglo | Stonewood Developments Limited | 2005 02 15 | Facility Letter | Mail |
| Anglo | Pizarro Developments Limited | 2005 02 23 - 2005 09 01 | Statements | Mail |
| Anglo | Foxrock LLC | 2005 02 24 | Facility Letter | Mail |
| Anglo | Pizarro Developments Limited | 2005 03 07 | Facility Agreement | Mail |
| Anglo | Pizarro Developments Limited | 2005 03 07 | Facility Agreement No. 2 | Mail |
| Anglo | Pizarro Developments Limited | 2005 03 07; 2007 01 15; 2008 11 03; 2009 08 13 | Facility Agreements | Mail |

| Anglo | Fusano Properties Limited | 2005 03 15 - 2008 11 10 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2005 03 15 - 2008 12 16 | Statements | Mail |
| Anglo | Stonewood Developments Limited | 2005 07 08 - 2006 08 18 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2005 08 31 - 2006 06 20 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2005 09 01 - 2010 08 27 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2005 09 08 - 2006 05 21 | Statements | Mail |
| Anglo | Island Associates Limited | 2005 10 06 - 2005 10 17 | Statements | Mail |
| Anglo | Shieldpoint Limited | 2005 11 14 - 2006 01 11 | Statements | Mail |

| Anglo | Bluecrown | 2005 11 29 | Facility Agreement (part 1) | Mail |
|---|---|---|---|---|
| Anglo | Bluecrown | 2005 11 29 | Facility Agreement (part 2) | Mail |
| Anglo | Bluecrown | 2005 12 15 ; 2006 05 08 | Facility Letter | Mail |
| Anglo | Kilberry Group Properties Limited | 2005 21 09 | Facility Letter | Mail |
| Anglo | Bluecrown | 2006 01 03 - 2012 01 06 | Statements | Mail |
| Anglo | Bluecrown | 2006 01 08 - 2011 03 03 | Statements | Mail |
| Anglo | Bellpark Developments Limited | 2006 02 06 | Facility Letter | Mail |
| Anglo | Haytonvale Developments Limited | 2006 02 06 | Facility Letter | Mail |

| Anglo | Haytonvale Properties Limited | 2006 02 06 | Facility Letter | Mail |
| Anglo | Michael O'Reilly & Aruba Properties Ltd. | 2006 02 22 | Facility Letter | Mail |
| Anglo | Bluecrown | 2006 03 01 - 2012 06 01 | Statements | Mail |
| Anglo | Benray Limited | 2006 03 28 | Facility Letter | Mail |
| Anglo | Benray Limited | 2006 03 30 | Letter of Amendment | Mail |
| Anglo | Bellpark Developments Limited | 2006 04 07 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2006 04 18 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2006 04 18 | Loan Agreement | Mail |

| Anglo | Pizarro Developments Limited | 2006 05 08 - 2007 05 30 | Statements | Mail |
| Anglo | Bloomsday Trust | 2006 05 08 | Facility Letter | Mail |
| Anglo | Bloomsday Trust | 2006 05 08 | Terms Sheet re: RidgeView Dr. | Email |
| Anglo | Flynn | 2006 05 08 | Terms Sheet | Email |
| Anglo | Foxrock LLC | 5-8-06 | Re; RidgeView Loan | Mail |
| Anglo | Coolbrook Developments Limited | 2006 05 16 - 2007 12 06 | Statements | Mail |
| Anglo | Coolbrook Developments Limited | 2006 05 16 | Facility Letter | Mail |
| Anglo | Tibany Properties Limited | 2006 06 06 | Facility Letter | Mail |
| Anglo | Fusano Properties Limited | 2006 06 12 - 2008 11 10 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2006 06 20- 2008 11 11 | Statements | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Bluecrown | 2006 06 28 - 2012 06 01 | Statements | Mail |
| Anglo | Bloomsday Trust | 2006 07 11 | Guarantee Agreement | Mail |
| Anglo | Bloomsday Trust | 2006 07 26 | Construction Mortgage & Security Agreement | Mail |
| Anglo | Bloomsday Trust | 2006 07 26 | Construction Loan Agreement | Mail |
| Anglo | Bluecrown | 2006 08 01 - 2011 03 02 | Statements | Mail |
| Anglo | Belfield Office Park Ltd | 2006 08 31 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Properties Ltd. | 2006 10 03 - 2011 04 02 | Statements | Mail |
| Anglo | Mountville Developments Ltd. | 2006 10 19 | Facility Letter | Mail |

| Anglo | Michael O'Rielly & Aruba Properties Ltd. | 2006 11 09 | Facility Letter | Mail |
|-------|-------|-------|-------|-------|
| Anglo | Fusano Properties Ltd. | 2006 12 01; 2009 07 28 51 | Facility Letters | Mail |
| Anglo | Bluecrown | 2006 12 13 - 2009 09 28 | Statements | Mail |
| Anglo | Bluecrown | 2006 12 13 - 2010 11 09 | Statements | Mail |
| Anglo | Bluecrown | 2006 12 13 | Facility Letter | Mail |
| Anglo | Bellpark Developments Limited | 2006 13 06 - 2010 02 07 | Statements | Mail |
| Anglo | Tibany Properties Limited | 2006 18 04 | Statements | Mail |
| Anglo | Bellpark Developments Limited | 2006 20 07 - 2010 31 12 | Statements | Mail |
| Anglo | Bellpark Developments | 2006 20 07 - 2011 02 09 | Statements | Mail |

| | Limited | | | |
|---|---|---|---|---|
| Anglo | Michael O'Rielly & Aruba Properties Limited | 2006 22 02 | Facility Letter | Mail |
| Anglo | Tibany Properties Limited | 2006 26 06 - 2008 19 05 | Statements | Mail |
| Anglo | Tibany Properties Limited | 2006 27 06 - 2007 01 03 | Statements | Mail |
| Anglo | Tibany Properties Limited | 2006 27 06 - 2008 18 05 | Statements | Mail |
| Anglo | Tibany Properties Limited | 2006 27 06 - 2008 19 05 | Statements | Mail |
| Anglo | Benray Limited | 2006 28 03 - 2011 16 09 | Statements | Mail |
| Anglo | Benray Limited | 2006 28 03 | Facility Letter | Mail |
| Anglo | Benray Limited | 2006 28 04 - 2011 16 09 | Statements | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Pizarro Developments Limited | 2007 01 01 - 2008 07 30 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2007 01 01 | Facility Letter | Mail |
| Anglo | Bellpark Developments Limited | 2007 01 03 - 2009 31 12 | Statements | Mail |
| Anglo | Mountville Developments Limited | 2007 03 29 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Properties Limited | 2007 04 10 | Facility Letter | Mail |
| Anglo | Pizarro Developments Limited | 2007 05 08 - 2011 06 02 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2007 05 30 - 2008 02 05 | Statements | Mail |

| | Bluecrown | 2007 07 31 - 2011 05 27 | Statements | Mail |
|---|---|---|---|---|
| Anglo | Bluecrown | 2007 08 09 | Facility Letter | Mail |
| Anglo | Mountvville Developments Ltd. | 2007 08 28 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Properties Ltd. | 2007 10 04 | Facility Letter | Mail |
| Anglo | Pizarro Developments Ltd. | 2007 10 18 - 2011 07 01 | Statements | Mail |
| Anglo | Fusano Properties Limited | 2007 12 05 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Properties Limited | 2007 14 05 - 2011 04 02 | Statements | Mail |
| Anglo | Bellpark Developments Limited | 2007 15 03 | Facility Letter | Mail |

| Anglo | Tibany Properties Limited | 2007 30 07 | Facility Letter | Mail |
|---|---|---|---|---|
| Anglo | Coolbrook Developments Limited | 2008 01 31 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Properties Limited | 2008 02 12 | Facility Letter | Mail |
| Anglo | Benray Limited | 2008 02 19 | Facility Letter | Mail |
| Anglo | John Flynn | 2008 02 22 | Anglo Private Shares | Mail |
| Anglo | Bellpark Developments Limited | 2008 04 11 | Email looking for interest | Email |
| Anglo | John Flynn (Block 9 Blackrock) | 2008 05 12 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Properties Limited | 2008 05 12 | Letter of Amendment | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Mountville Developments Limited | 2008 05 12 | Facility Letter | Mail |
| Anglo | Bellpark Developments Limited | 2008 07 10 | Facility Letter | Mail |
| Anglo | Pizarro Developments Limited | 2008 07 28 - 2011 07 01 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2008 08 12 - 2011 07 01 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2008 08 28 - 2011 07 01 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2008 09 01 - 2011 07 01 | Statements | Mail |
| Anglo | Bluecrown | 2008 09 23 | Facility Letter | Mail |
| Anglo | Bloomsday Trust | 2008 09 | Facility Letter | Mail |
| Anglo | Bellpark Developments Limited | 2008 10 07 | Facility Letter | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | John Flynn (lighthouse cinema & unit 11, Smithfield) | 2008 11 03 | Facility Letter | Mail |
| Anglo | Pizarro Developments Limited | 2008 11 03 | Facility Letter | Mail |
| Anglo | John Flynn Snr. | 2008 11 04 - 2011 01 24 | Statements (Smithfield) | Mail |
| Anglo | Michael O'Rielly & Aruba Properties t/a Ashbourne Retail Park | 2008 12 02 ; 2009 04 29 ; 2008 05 12 | Facility Letters | Mail |
| Anglo | Bellpark Developments Limited | 2008 12 05 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Properties Limited | 2008 12 05 | Letter of amendment | Mail |

| Anglo | Bellpark Developments Limited | 2008 17 09 - 2010 01 07 | Statements | Mail |
| Anglo | Benray Limited | 2008 19 02 | Facility Letter | Mail |
| Anglo | Michael O'Rielly & Aruba Propertiees Limited | 2008 23 08- 2011 07 02 | Statements | Mail |
| Anglo | Tibany Properties Limited | 2008 28 02 - 2008 23 05 | Statements | Mail |
| Anglo | Bellpark Developments Limited | 2009 01 01 - 2011 02 09 | Statements | Mail |
| Anglo | Belfield Office Park Limited | 2009 01 22 | Mortgage Debenture | Mail |
| Anglo | Bloomsday Trust | 2009 02 02 - 2009 07 02 | Statements | Mail |
| Anglo | Bloomsday Trust | 2009 02 02 - 2010 04 02 | Statements | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Bloomsday Trust | 2009 02 02 - 2011 09 30 | Statements | Mail |
| Anglo | Mountville Developments Limited | 2009 05 11; 2008 05 12; 2007 11 27; 2007 08 28; 2007 03 29 | Facility Letters | Mail |
| Anglo | Bloomsday Trust | 2009 05 20 - 2011 11 | Statements | Mail |
| Anglo | Bloomsday Trust | 2009 06 02 - 2010 04 02 | Statements | Mail |
| Anglo | Bloomsday Trust | 2009 07 31 - 2011 09 30 | Statements | Mail |
| Anglo | Pizarro Developments Limited | 2009 08 13 | Facility Letter | Mail |
| Anglo | Bluecrown | 2009 09 30 - 2011 04 20 | Statements | Mail |
| Anglo | Pamarette Limited | 2009 10 13 | Facility Letter | Mail |
| Anglo | Bloomsday Trust | 2010 04 30 - 2011 09 30 | Statements | Mail |

| | | | | |
|---|---|---|---|---|
| Anglo | Bloomsday Trust | 2010 04 30 - 2011 09 31 | Statements | Mail |
| Anglo | Bloomsday Trust | 2010 07 02 - 2011 09 30 | Statements | Mail |
| Anglo | Pamarette Limited | 2010 10 19 | NAMA acquisition of eligible bank assets. | Mail |
| Anglo | Pamarette Limited | 2010 12 24 | Letter from Anglo claiming facility breach | Mail |
| NAMA | Pamarette Limited | 2011  03 25 | Demand Letter | Mail |
| NAMA | Elaine Flynn (Pamarette Ltd.) | 2011 03 25 | Demand Letter | Mail |
| NAMA | John Flynn Jnr (Pamarette) | 2011 03 25 | Demand Letter | Mail |
| NAMA | James Flynn (Pamarette Ltd.) | 2011 03 25 | Demand Letter | Mail |

| | | | | |
|---|---|---|---|---|
| NAMA | Leona Flynn (Pamarette) | 2011 03 25 | Demand Letter | Mail |
| NAMA | John Flynn Snr. (Pamarette) | 2011 03 25 | Email to NAMA re: Anglos withholding of security Documents | Mail |
| Benray Ltd | NAMA | 2011 06 07 | Letter from IBRC NAMA re: business plan, reference to interest at end | Email |
| IBRC/ NAMA | Flynn Family | 2011 07 14 | Letter re: overcharging & Refund | Mail |
| IBRC | Pamarette | 2012 03 06 | Notice of Set Off Re: Belfield | Mail |
| NAMA | James Flynn | 2012 08 01 | Email to NAMA responding to the pressure of returning signed security docs | Mail |
| James Flynn | NAMA | 2012 10 15 | Email to & from NAMA re Pressuring the | Email |

| | | | return of Ashbourne security docs | |
|---|---|---|---|---|
| James Flynn | NAMA | 2012 10 29 | Reservation of Rights Re: Belfield | Email |
| | | | Demand Letter (Belfield) | |
| NAMA | John Flynn Jnr | 2012 11 01 | Letters sent to Havtonvalle Properties Ltd. And separately to each | Mail (UK) |
| NAMA | James Flynn | 2013 02 05 | partner threatening punitive actions should they not withdraw from NY case | Mail |
| NAMA (Michael Foley) | Haytonvale Properties Ltd, Paddy Kelly, Simon Kelly, Christopher Kelly, Alan McCormack, Niall McCormack, Brian McCormack. | 2013 06 17 | Letters sent to Havtonvalle Developments Ltd. And separately to each partner threatening punitive actions should they not withdraw from NY case | Mail |
| NAMA (Michael Foley) | Haytonvale Developments Ltd, Paddy Kelly, Simon Kelly, Christopher Kelly, Alan | 2013 06 17 | Letters sent to Nesco Properties Ltd. | Mail |

| | McCormack, Niall McCormack, Brian McCormack. | | And separately to each partner threatening punitive actions should they not withdraw from NY case | |
|---|---|---|---|---|
| NAMA (Michael Foley) | Letters sent to Nesco Properties Ltd. And separately David Colgan, Patrick Kelly, John McCormack, Brian McCormack, Alan McCormack, Niall McCormack, Finian McDonnell, Philip Monaghan, Patrick Ryan | 2013 06 17 | Letters sent to Pizarro Developments Ltd. And separately to each partner threatening punitive actions should they not withdraw from NY case | Mail |
| NAMA (Michael Foley) | Letters sent to Pizarro and separately to 17 partners | 2013 06 17 | Letters sent to Coolbrook Developments Ltd. And separately to each partner | Mail |

| | | | | |
|---|---|---|---|---|
| NAMA (Michael Foley) | Letters sent to Coolbrook Developments Limited and separately to Patrick Kelly, Maureen Kelly, Simon Kelly, Emma Kelly, John Kelly, Chris Kelly. | 2013 06 17 | threatening punitive actions should they not withdraw from NY case<br><br>Letter copying threats made to partners on foot of NY case | Mail |
| NAMA (Michael Foley) | James Flynn | 2013 06 18 | Demand Letter on Loan that covered interest. | Mail |
| NAMA | James Flynn, John Flynn, Elaine Flynn, John Flynn Jnr. | 2013 10 04 | Appointment of receiver to Ashbourne | Mail (US, UK & IRL.) |
| NAMA | James Flynn | 2013 10 31 | Demand Letter | Letter & Email |
| NAMA | Delaford Properties Ltd | 2013 10 31 | Appointment of Receiver | Letter & Email |

| | | | | |
|---|---|---|---|---|
| NAMA | Michael O'Rielly | 2013 10 31 | | Letter & Email |
| NAMA | Mountville Dev. | 2013 11 04 | Appointment of Receiver | Mail & Email |
| NAMA | Mountville Dev. | 2013 11 05 | Appointment of Receiver | Mail & Email |
| NAMA | John Flynn Snr., James Flynn, Elaine Flynn, John Paul Flynn. | 2013 11 07 | Demand Letter on foot of Aruba Properties Limited Demand Letter Bellpark Dev. Ltd. | Mail (US, UK, Irl.) |
| NAMA | James Flynn, John Flynn, Elaine Flynn, John Paul Flynn | 2013 11 07 | Demand Letter on foot of Mountville guarantee to Delaford | Mail (US, UK, & Irl) |
| NAMA | Mountville Deveolpments Ltd. | 20113 11 07 | Demand Letter on foot of Mountville Guarantee | Mail |
| NAMA | James Flynn | 2013 11 07 | Demand Letter on Mountville | Mail |

| | | | | |
|---|---|---|---|---|
| NAMA | James Flynn | 2013 11 13 | Appointment of Receiver to Bellpark Dev. | Mail & Email |
| Russell Brennan Kane (Receiver) | Bellpark Dev. | 2013 12 02 | Appointment of Receiver to Bellpark property | Mail & Email |
| Russell Brennan Kane (Receiver) | James Flynn | 2013 12 02 | | Mail & Email |